UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

Civil Action 05-11355 JLT

_____

UNICARE LIFE & HEALTH INSURANCE CO.
    Plaintiff-Stakeholder

v.

CHANTAL PHANOR, RUTH PAMPHILE,
BEVERLY PAMPHILE, SONIA PAMPHILE,
WIDLENE CESAR, JUDY PAMPHILE,
JEFFREY PAMPHILE, BRUNEL PAMPHILE
AND CARTWRIGHT FUNERAL HOME
    Defendants

_____

MOTION FOR SUMMARY JUDGMENT BY WIDOW, DEFENDANT RUTH PAMPHILE, AND CHILDREN ( DEFENDANTS BEVERLY PAMPHILE, JUDY PAMPHILE, JEFFREY PAMPHILE, AND BRUNEL PAMPHILE)

    Now come Defendants Ruth Pamphile, Beverly Pamphile, Judy Pamphile, Jeffrey Pamphile, and Brunel Pamphile, and move this court for summary judgment either in favor of the decedent's widow, Ruth Pamphile, or his surviving children, Beverly Pamphile, Judy Pamphile, Jeffrey Pamphile, and Brunel Pamphile, and for the award of the proceeds of a certain life insurance policy and its supplement which covered the life of Decedent, Joseph Pamphile, as an employee of Partners HealthCare Systems, Inc. ( Group Policy No. GI 28518 with Unicare Life & Health Insurance Company.) either directly, or by way of the imposition of a constructive trust. They do so based upon the reasons set forth in their accompanying memorandum in

support of this motion, supported by their concise statement of undisputed facts, the Affidavits of Ruth Pamphile, Jeffrey Pamphile, and Judy Pamphile, and supporting exhibits.

          By Counsel,

          */s/ Alanna G. Cline*

          Alanna G. Cline
          Attorney at Law
          BBO 086860
          300 Market St.
          Brighton, MA 02135
          617 783 5997

July 31, 2006

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

Civil Action 05-11355 JLT

_____

UNICARE LIFE & HEALTH INSURANCE CO.
  Plaintiff-Stakeholder

v.

CHANTAL PHANOR, RUTH PAMPHILE,
BEVERLY PAMPHILE, SONIA PAMPHILE,
WIDLENE CESAR, JUDY PAMPHILE,
JEFFREY PAMPHILE, BRUNEL PAMPHILE
AND CARTWRIGHT FUNERAL HOME
  Defendants

_____


AFFIDAVIT OF RUTH PAMPHILE IN SUPPORT OF MOTION OF WIDOW AND
CHILDREN'S MOTION FOR SUMMARY JUDGMENT

I, Ruth Pamphile, do state and depose as follows:

1.  I am an adult.  I live at 29 Seymour St., Roslindale, MA with my children

2.  I was married to Joseph Pamphile in Boston on March 8, 1984.

3.  We have four children: Beverly, born 3/2/0/84, Judy, born 2/2/86, Jeffrey, born 5/25/88,

and Brunel, born 6/22/00.

4.  We separated in May of 2001 due to disputes over financial issues: I opposed refinancing

  and refinancing arrangements, so we separated, but were trying to work out our

differences.  We were not successful, and did not reconcile.  My husband died on March 23,

2005.

5.      Throughout their marriage, I worked full time as a nursing aide at the St. Elizabeth's Hospital in Brighton, MA.  After the birth of our youngest son, I had to reduce my working hours, and worked *per diem* after that, at the same job, but without benefits.  I continue to work there now, and have just been able to resume a full-time schedule.  My husband worked for Partners Healthcare System, Inc., in accounting, with full benefits including the term life insurance, and supplemental term life insurance.  That coverage was his only life insurance.

6.      I was never served with any motion from Mr. Pamphile to be relieved of any part of the Automatic Restraining Order.

7.      Our older daughter, Beverly, was admitted to Tufts University after graduating from Newton Country Day School.  During divorce proceedings, and due to our disputes, her education at Tufts was compromised and interrupted.  While she has taken some courses elsewhere, she has been unable to return to Tufts as yet, particularly due to loan complications resulting from my husband's death; and she is also so deeply afflicted with grief that at present, she finds it easier to come and go for the time being, so hasn't been asked for an affidavit.

8.      Judy graduated from Beaver Country Day School.  She attends the University of Massachusetts in Amherst, MA.

9.      Jeffrey has graduated Beaver Country Day School and attends the University of Massachusetts in Amherst, MA.

10.     Brunel, has just started school.  He also attends an age-appropriate program at the New England Conservatory.

11.     Beverly now works full-time, and is trying to pursue out-of-state options for her

continued education.  Our two middle children work part-time, and also expend time and energy for the care of their younger brother, and for the upkeep and maintenance of our home, as does our oldest child when she is local.

12. Both my husband and I each made substantial financial contributions and expenditures towards the children's education, and I endeavor to continue to do so within her limited means.

13. At death, my husband left no known estate to administer beyond his car and personal items.  I have been appointed as his voluntary personal representative. *Ex. 3.*

14. Between May, 2001 and January 22, 2002, my husband personally paid out about $6,000 towards the children's current education expenses, including tuition and books, and about $1000 more towards their clothing and a bed, all from a refinancing of the family's home; and funds were also spent on necessary repairs and maintenance as well as credit card payments and payoffs, with the lion's share of the remainder spent for Mr. Pamphile new life and his attorney. *Ex. 4.*  He also signed tuition loans for Beverly's career at Tufts, which are now in default.

15. Due to fear about my husband's response, I sought no direct child support order, and relied on my husband's voluntary payments and contributions, my income, the children's part-time earnings, and (unreliable) rental income from the rental units (as reported on the parties' joint tax returns, before depreciation, net rents totaled $2000-$3000 a year ).

16. During our separation through the present, I have continued in my *per diem* nursing aide job, and began regularly taking courses at Bunker Hill Community College in hopes of completing a college education and a nursing degree.   My husband was the primary breadwinner, earning around $680 a week, while I was the primary homemaker, earning about

$210 weekly.

17. I understand that my husband lived alone in his own apartment until shortly before his death, when he lost his apartment and moved in to his girlfriend's apartment.

18. I understood my husband to enjoy good health until well into divorce proceedings, when he was diagnosed with T-cell Lymphoma, a form of lymphoma that is understood to be transmitted by intimate contact including birth and sexual activity, and may be harbored for decades, based on information. Therefore, there is an issue about whether I and our children are at risk and will need medical monitoring and follow-up. I suffers from diabetes, and have been recently informed of immune system issues.

19. Soon after my husband's death, I received word from two of my sisters-in-law, Sonia Sergo Pamphile, passing on information received from Chantal Phanor to the effect that there was no insurance and that the policy had been cancelled. I know of no other life insurance.

20. While my husband and I pursued cross actions for protection from abuse, I never abused or threatened my husband. One time, when he attempted to force his way into the house (after separation), he pinned me against our house hallway, and I felt my neck and shoulder were about to break, and I bit him to gain release. However, it was I who was arrested and charged. Now, having read through the medical and nursing home records, I understand that much of the conflict between us may well have been due to his encephalopathy, from an inception earlier than his formal diagnosis.

21. At no time have I ever been served with any pleadings concerning any restraining order application for Chantal Phanor, nor do I know of her obtaining any such order..

   Signed under the pains and penalties of perjury this July 31, 2006.

*/s/ Ruth Pamphile*

_____

Case 1:05-cv-11355-JLT    Document 43-2    Filed 08/01/2006    Page 6 of 7

.

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

Civil Action 05-11355 JLT

_____

UNICARE LIFE & HEALTH INSURANCE CO.
    Plaintiff-Stakeholder

v.

CHANTAL PHANOR, RUTH PAMPHILE,
BEVERLY PAMPHILE, SONIA PAMPHILE,
WIDLENE CESAR, JUDY PAMPHILE,
JEFFREY PAMPHILE, BRUNEL PAMPHILE
AND CARTWRIGHT FUNERAL HOME
    Defendants

_____

AFFIDAVIT OF DEFENDANT IN SUPPORT OF WIFE AND CHILDREN'S

MOTION FOR SUMMARY JUDGMENT

I, Judy Pamphile, do state and depose as follows:

1.     I am an adult with my usual residence at 29 Seymour St., Roslindale, MA where I live with my mother, Ruth Pamphile, and my brothers and sister.

2.     After my parent's separation in 2001, my brothers, sister, and I regularly visited with our father, Joseph Pamphile.  We also regularly shared holidays and birthdays.  I understood him to live by himself in Randolph from the time of my parent's separation.  We did not stay overnight with him there for several years.  I understood that to be due to his not having furniture until then, as he explained to me.

3.     I attended and graduated from Beaver Country Day School in 2004.  Each of my parents made separate payments for my tuition, books, activities, and school expenses throughout my attendance there.

1

4. I was aware that my father was giving a lot of financial help to Beverly to attend Tufts University. So, it was my hope to substantially finance my own college education by way of scholarships and loans, as well as working.

5. I had a savings account which I dedicated to my college expenses. My father made a few small deposits when he had a few extra dollars.

6. My father and I often talked about my education. He repeatedly told me that he wanted me to finish high school and college, and that I could be a doctor and I should apply and plan to study a pre-med set of courses. I felt he was trying to strongly encourage me to become a doctor both because I could really be of help that way, and because it would give me a better life style than we had growing up. I understood my father to make his best financial efforts for us, as he had with Beverly, and so I understood that he would help me financially with college if he could at all do so. It was a given. We never discussed it, but that was how he treated his children..

7. I saw my father regularly, including in 2004. Generally, we and my father were free to arranged visits directly, and did so. In September, 2004, my father drove me out to Amherst to begin my college year at the University of Massachusetts. He helped me buy necessities for my room and school supplies, helped me unpack and set up the room, and shared campus eating with me.

8. When I returned for Thanksgiving, I again visited with my father.

9. Between Thanksgiving and March, 2005, my brother and I made many calls to my father to arrange to see him, but we only heard from him sporadically. No one told me that he was ill. I believe that he was trying to protect me and my siblings from what was going on.

10. In March, 2005, I returned from school when I received word that my father was very ill. I came home and went directly to Brigham and Women's Hospital with my brothers. My mother drove us there. We went in and went up to his room. As we were walking to his room, he yelled not to let us in, saying "she's here, she's in the building...". A nurse went in to check on him and to try to calm him down. She then came out and said we would have to leave. So, I did not see my father, and he did not see me.

11. Several days later, we again tried to visit my father. I believe it was Thursday, March 10, 2005. This time, I went only with my brother, Jeffrey. Again, my mother drove us. We went into his room, and I kissed my father. He was asleep, and my kiss woke him up. We sat down next to him. He opened his eyes and looked at us, and asked why we hadn't called him. While I had called him for some time with no return calls, there was a time period I had given up. I simply told him I was sorry. He seemed happy to see us there. We just sat with him. I held his hand. We prayed together. The nurses came in from

      time to time, and we had to leave at one point so the nurses could care for him, but returned. My father was clearly very ill, very weak, and very incapacitated. He had aged many years in a short time. He seemed able to lift his hands and arms only with great effort, slowly.

12. While my brother and I were there, a pastor came in to minister to my father. As well, there were friends and co-workers from my father's job. At one point, we were asked to leave because he was going to be prayed for by them, It made no sense to me, but I complied. We were outside of his room for about half-an-hour.

13. Jeffrey and I went again to visit my father the following Saturday. There were a lot more friends there, and my Aunt Pepete (Widlene Cesar). We arrived late afternoon, and stayed until 10 or 10:30 that night. Again, it was a close, warm, and prayerful time together. My father seemed a lot worse. Chantal Phanor had been there when we arrived, but she left immediately (otherwise, she was never there when we visited). My father was mumbling in Creole, which my aunt translated, and from which I understood that my father thought he was seeing my deceased grandmother (his mother) in the corner of his room. He was mumbling otherwise, and grabbing and toying with anything that was in my hand, or around my neck, just as a toddler might do. I was told by a friend of his not to expect him to survive the night.

14. My brother and I returned on Sunday to visit again. I found my father very improved, and now able to speak with us. He was still very weak, but seemed much more himself, and I learned that my father was going to be discharged. Since he was so much better, I returned to school after we visited. We talked about visiting soon again, and he seemed he was looking forward to that.

15. When I called from school on Monday, March 14, I spoke with my father. We talked about my visiting him again. After that, I kept trying to call, but could only leave voice mail messages until his box was full.

16. About a week later, I learned my father had died, so I returned to join my family at his funeral.

      Signed under the pains and penalties of perjury this July 31, 2006.

                                                          /s/ *Judy Pamphile*

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

Civil Action 05-11355 JLT

_____

UNICARE LIFE & HEALTH INSURANCE CO.
    Plaintiff-Stakeholder

v.

CHANTAL PHANOR, RUTH PAMPHILE,
BEVERLY PAMPHILE, SONIA PAMPHILE,
WIDLENE CESAR, JUDY PAMPHILE,
JEFFREY PAMPHILE, BRUNEL PAMPHILE
AND CARTWRIGHT FUNERAL HOME
    Defendants

_____


AFFIDAVIT OF DEFENDANT JEFFREY PAMPHILE  IN SUPPORT OF WIFE AND CHILDREN'S

MOTION  FOR SUMMARY JUDGMENT

I, Jeffrey Pamphile, do state and depose as follows:

1. I am an adult with my usual residence at 29 Seymour St., Roslindale, MA where I live with my mother, Ruth Pamphile, and my brother and sister.

2. After my parent's separation in 2001, my brother, sister, and I regularly visited with our father, Joseph Pamphile.  We also regularly shared holidays and birthdays.  I understood he lived in his own apartment in Randolph from the time he and my mother separated. . We did not stay overnight with him there for several years.  We did not stay overnight, though, because he had no furniture, as he told us.

3. I went to and graduated from Beaver Country Day School in 2006.  Each of my parents made payments for my tuition, books, activities, and school expenses there.

1

4. I knew that my father was giving a lot of financial help to Beverly to attend Tufts University. So, I expected that I would finance my own college education by scholarships and loans, and working.

5. I have a checking account which I plan to dedicate to my college expenses.

6. My father and I often talked about my education. We discussed his desire that he wanted me to finish high school and college, and that I could be a lawyer. I felt he was trying to strongly encourage me to pursue a field in which I would prosper financially. I understood my father to make his best financial efforts for us, as he had with Beverly, and so I assumed that he would help me financially with college if he could do so. It was a given. We never discussed it, but that was how he treated all of us.

7. I saw my father regularly, including in 2004. Generally, we and my father were free to arrange visits ourselves, and we did. We often went out to eat or some other leisurely activity where we would discuss varied topics

8. Between Thanksgiving and March, 2005, my sister and I made many calls to my father to arrange to see him, but we only heard from him sporadically. No one told me that he was ill. I believe that he was trying to protect us from what was going on with his illness.

9. In March, 2005, my mother received word that my father was very ill. She immediately called my sister home from school and took us to visit him   My mother drove us there. We went in and went up to his room. As we were walking to his room, he yelled not to let us in, saying "she's here, she's in the building...". A nurse went in to check on him and to try to calm him down. She then came out and said we would have to leave. So, I did not see my father, and he did not see me.

10. Several days later, we again tried to visit my father. I believe it was Thursday, March 10, 2005. This time, I went only with my sister, Judy. Again, my mother drove us. We went into his room and we both hugged him, and Judy kissed him. We sat down next to him. He opened his eyes and looked at us, and asked why we hadn't called him. While I had called him over several weeks with no return calls, there was a time period I had given up. I, too, just told him I was sorry. He was happy to see us there. We just sat him. I held his hand, too, and we prayed together. The nurses came in from time to time, and we had to leave at one point so the nurses could take care of him, but returned. My father was very ill, very weak, and very incapacitated. He had aged many years in a short time. He seemed able to lift his hands and arms only with great effort, slowly.

11. While my sister and I were there, a pastor came in to minister to my father. As well, there were friends and co-workers from my father's job. At one point, we were asked to leave because he was going to be prayed for by them. It made no sense to me, but I did as I was asked. We were outside of his room for about half-an-hour.

12. Judy and I went again to visit my father the following Saturday. There were a lot more friends there, and my Aunt Pepete (Widlene Cesar). We arrived late afternoon, and stayed until 10 or 10:30 that night. Again, it was a solemn, nurturing, connected time for us together, though my father could not hold my hand because he was shaking. My father seemed a lot worse. Chantal Phanor had been there when we arrived, but she left immediately (otherwise, she was never there when we visited). I was somewhat frightened by father's state because he was completely delirious. He was mumbling, and grabbing and toying with any random thing I was holding, as a very young child might do. Also, he was wide-eyed and sometimes had an odd grin on his face; and sometimes there were a lot of gesticulations that seemed to be efforts to communicate, but I did not understand what he meant, if anything. Later that night, I was told by a friend of his not to expect him to survive the night.

13. My brother, my sister, and I returned on Sunday to visit again. I found my father very improved, and now able to speak with us. He was still very weak, but seemed much more himself, and I learned that my father was going to be discharged. I wasn't sure that I agreed with his decision because although stable, in my eyes, he had not fully recovered, and I did not think he was sufficiently recovered to be released yet from the hospital, particularly since I hoped and thought he could be dialyzed again, before leaving.

14. Later on, maybe a day or so after my last visit, I tried to contact him but he never answered his phone.

15. About a week later, I learned my father had died.

    Signed under the pains and penalties of perjury this July 31, 2006.

    /s/ Jeffrey Pamphile
    _____