UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action 05-11355 JLT
_____

UNICARE LIFE & HEALTH INSURANCE CO.
Plaintiff-Stakeholder

v.

CHANTAL PHANOR, RUTH PAMPHILE, BEVERLY PAMPHILE, SONIA PAMPHILE,
WIDLENE CESAR, JUDY PAMPHILE, AND CARTWRIGHT FUNERAL HOME
Defendants
_____

## MEMORANDUM IN SUPPORT OF PAMPHILE WIDOW'S AND PAMPHILE CHILDREN'S MOTION  FOR SUMMARY JUDGMENT

### *1.   Nature of Action*

Unicare Life and Health Insurance Company filed this interpleader action to determine distribution of life insurance proceeds between four competing beneficiary designations.  Joseph Pamphile was insured as a benefit of his employment.  He and Ruth Pamphile married in 1984.  At his death, he remained married to her, and she and their four children were his dependents, both in law and in fact.  *Facts Nos. 1-12; 14-16.*   The first designation directed benefits to his wife.  The second directed benefits to his children.  The third directed benefits to a combination of two sisters, his elder daughter, and his girlfriend.  The fourth directed benefits to his girlfriend, alone, if she survived, and a sister, if his girlfriend did not survive.

Mr. Pamphile initiated a divorce in Massachusetts on November 1, 2001.  *Ex. 1.* Upon filing the divorce, an automatic restraining order issued against him.  That restrained him, along with all other marital litigants, from certain acts. *Ex.2.*  (The order applied to defendants upon service).   The order was, and remains, directed to all marital litigants.  *Inter alia,* its terms

expressly concern, and expressly apply to, any and all life insurance.  It renders that life

insurance security for court awards of alimony, child support,  property distribution and

assignment orders, be those by way of interlocutory orders *pendente lite,* or final judgments.

The order remained in place throughout Mr. Pamphile's lifetime, and the parties' marriage, until

after his death.  At death, he and his wife remained married.  There had been neither trial nor

settlement of the pending divorce.  *Fact No. 3.*

## *2. Relief Sought*

By this motion for summary judgment, Mrs. Pamphile seeks award of the life insurance to

herself or her children; and her children seek its award to themselves or their mother.

## *3.   Salient Legal Facts re: Erisa Issues and Competency Issues*

Mr. Pamphile, along with all such marital litigants, was expressly restrained from  chang-

ing his life insurance beneficiary designation, *Ex. 1.*  He was specifically enjoined from changing

the beneficial status of his Wife and children under *any* then-existing life insurance policies,

absent express state court permission. *Id.* The order permitted application for leave to make such

changes, upon only 2 days notice of a motion. *Id.*  Mr. Pamphile never asked for relief.   His only

insurance was part of an employee welfare plan. *Facts Nos. 4, 5, 19.*  At death, his estate value

was too small to warrant any formal administration, as he left only his car.  *Facts No. 13, Ex. 12.*

Within 6 months of a May, 2001 refinancing of the Pamphile home, the net proceeds and

interest totaling over $64,000 had been exhausted, with $6,000 having been spent for the

children's needs and educations, alone.  *Facts No. 14.*  Without leave of court or disclosure, in

2004, Mr. Pamphile's beneficiaries were changed. *Facts No. 6, 19-29.*   His Wife was removed,

and their children were substituted as beneficiaries.  As a practical matter, had matters stopped

2

there, no litigation would have ensued.

In late 2004 and early 2005, Mr. Pamphile was diagnosed with a T-cell lymphoma, *Exs. 5, 6.* By the time of a his last hospitalization on March 7, 2005, *Ex. 8,* he had suffered altered mental status. He was diagnosed as *non compos mentis,* and his healthcare proxy was implemented. *Ex. 8.* At discharge on March 15, 2005, he had improved, but was still *non compos mentis,* with further decline anticipated. *Id.* He was admitted to a nursing facility for end-of-life care on March 21, 2005 based on several preceding days of decline. *Ex. 9.*

Notwithstanding these facts, after a 2004 beneficiary change to the Pamphile children, *Ex. 10,* without court permission, around March 10, 2005, the employer received a 3rd party request asking for authority for another 3rd party to change Mr. Pamphile's life insurance beneficiaries. That was to remove three of the Pamphile children, to leave only one child as a beneficiary, and to add Mr. Pamphile's girlfriend and two sisters as beneficiaries, *Exs. 10, 11.* Again, this was without leave of court. A written request, in unknown handwriting, was not on an approved form. It appears to bear Mr. Pamphile's signature. Mr. Pamphile was then discharged to home, still *non compos mentis,* for hospice care, *Ex. 8, pp.4,5.* Then, by a form dated March 20th, again without leave of court, Mr. Pamphile signed an approved beneficiary change form. It sought to eliminate his children and sisters, and to designate his girlfriend as beneficiary for all benefits. After several days of decline, Mr. Pamphile was then admitted on March 21, 2005 to a nursing home. He died there on March 23, 2005, *Ex. 9,* still married to his wife. *Facts 19-30.*

Upon the divorce filing, all 4 of Mr. Pamphile's children were dependents, as was his wife. He was dedicated to his children's educations. *Facts Nos. 7-16, 32.* When he died, the three younger children remained in school, dependent and unemancipated. The dependency and

unemancipation of oldest had been interrupted, due to grief, defaulted education loans, and related issues, *Facts Nos. 11, 31*. Under *M.G.L. c. 208 s. 28,* she remains eligible for dependency and resumption of unemancipation as she is less than 23 years old,

Until his diagnosis, Mr. Pamphile was understood to be in good health.  Mrs. Pamphile suffered diabetes, and there are now immune system issues.  Both she and their children must now be monitored for T-cell carcinoma due to how its is transmitted, and the decades for which it can be harbored. *Facts No. 18.*  Ms. Phanor may anticipate similar needs, *Facts No. 18*.

Under the terms of the life insurance policy agreement, Mr. Pamphile's girlfriend was not a spouse, nor did she qualify as a domestic partner, nor was she a dependent in any sense.  *Ex.13.*  Indeed, Mr. Pamphile had lived in his own apartment.  He lost it shortly before his last illness, when he moved in with his girlfriend. *Facts No. 17.*  (His wife's desires to care for him are beyond the scope of this brief.)

*4.  Issues:*

Whether ERISA permits this court to enforce Massachusetts' Automatic Restraining Order either by *ERISA's* own terms; or aside from them, by a constructive trust, based on equity.

Whether as a matter of equity, a constructive trust should be imposed for the benefit of the decedent's wife and children.

Whether the two later beneficiary designation forms should be set aside based on the decedent's incompetency and incapacity, being diagnosed as *non compos mentis.*

*5.  Summary of Argument*

The life insurance proceeds should be distributed to the decedent's widow, due to the state's automatic restraining order.  Indeed, that statewide order, and its terms, distinguish the

4

instant case from most precedents.  Such case authorities as *Metropolitan Life Ins. Co. v. Flink-strom, 02-12309-JLT, (D. Mass. 2004),  Sun Life Assurance Co. of Canada v. Sullivan et als, 206 F. Supp. 2d 191, 197 (2002),* and *Prudential Life Insurance Co. v. Schmidt, 337 F.Supp.2d 325 (D. Mass. 2004)*, construed significantly different Massachusetts marital litigation orders, all entered before a uniform, statewide automatic restraining order was law.  Mrs. Pamphile argues, in the alternative, that the statewide order meets *ERISA* exceptions requirements under *Boggs v. Boggs, 520 U.S. 833 (1997)* and *Sun Life Assurance Co. v. Sullivan, 206 F. Supp 2d 191 (2002)* for treatment as a Qualified Domestic Relations Order.  While the particular policy was not specifically identified in the order, there can be no ambiguity since the order applied to all (existing) life insurance, without any possible exception, and the order otherwise substantially complies with the requirements for a qualified domestic relations order.  Again in the alterna-tive, she also argues that the order meets the two-prong test set out in *Kentucky Ass'n. of Health Plans, Inc. v. Miller, 538 US 329 (2003):* it should be saved under  *29 U.S.C.§ 1 144(b)(2)(A)* since it is directed to the insurance industry (including, but not limited to, *ERISA-provided* insurance) and directly affects the risk pool both by restraining litigants from terminating or lowering coverage for existing spouse and child dependents, and by indirectly encouraging purchase of additional coverage for otherwise-intended substitute beneficiaries.

Again in the alternative, Mrs. Pamphile relies upon the rationales of *Southeast & Southwest Areas Pension Fund v. Howell et als, 2000 FED App. 0336P (6th Cir.*). Under principles of general equity - a matter of state law, and as a matter of substantial justice, at the instant of distribution to anyone else, this court may and should impose a constructive trust for the benefit of the decedent's widow and/or the Pamphile children, or remand the issue to the

5

state court for its own determination in that regard.   To do otherwise would deprive a widow

and her children of the economic security intended both by statewide law, and by ERISA, itself,

to protect such dependants, while providing a wind-fall to a non-dependent girlfriend.

*6. Massachusetts Statewide Marital Restraining Order*

    The state's probate court's standing restraining order, effective January 1, 2000, has

since applied to all prospective marital litigants in Massachusetts.  It was expressly formulated to

preserve the life insurance benefits of all marital litigants, *pendente lite,* for all dependents who

are subject to marital litigation.   Therefore, the paramount issue is its relationship to *ERISA,* and

the application of *ERISA* to its terms, which this circuit has not yet construed.

    *A.   The Automatic State Court Restraining Order Should be Treated as a Qualified*
*Domestic Relations Order as to Restraining Change of Beneficiaries of Life Insurance*

    The statewide restraining order enjoined changes of beneficial status of any and all life

insurance where, at the inception of the divorce proceeding, either spouse, or their offspring,

were designated beneficiaries.  Unlike the order construed in *Prudential Life Insurance Co. v.*

*Schmidt, 337 F.Supp.2d 325 (2004)*, the instant order does not arise from a judgment and divorce

agreement.  It requires no acquisition of insurance, and requires no particular dedication of any

particular life insurance policy.

    The *Prudential* court considered whether an order *restrained* changing beneficiaries, and

whether the order might be enforced and implemented under *ERISA.*  That order was directed to

only one person.  It made no reference to any existing life insurance, nor did it expressly protect

any existing life insurance.  It did no more than require the decedent to acquire and/or dedicate

(as applicable) life insurance to provide benefits for his daughter until she attained the age of 21.

It did not tell him how to do that.  It only told him to do that.  There was no reference to the

6

existence or handling of any then-current life insurance, nor was there any requirement that the child be provided life insurance after the age of 21 was attained.  *Pamphile's* statewide order, however, requires no acquisition or redirection of life insurance.  Instead, it requires maintenance of existing insurance, as it exists at the moment the divorce complaint is filed.

### B. The Statewide Order Qualifies as a Qualified Domestic Relations Order

*29 U.S.C. §§ 1056(d)(3)(B)(i) and (ii)* provides an express exception to *ERISA* control and preemption.  Any domestic relations order which qualifies under its terms is saved, and is not controlled or preempted by *ERISA*.  To be excepted, the order must "clearly specify" the identity and last known mailing address of the participant and of each alternate payee; the amount or percentage to be paid to each such alternate payee, or how it is to be determined; the number of payments or periods to which the order applies; and (iv) each plan to which the order applies.  Clearly, the requirements serve two purposes: sufficient notice to the benefits administrator or carrier to enable compliance with no more than reasonable effort, as discussed further, below; and an unambiguous determination of entitlement to the benefits at issue.

The subject order substantially accomplishes both purposes.  While its text does not specifically name the parties or their children, it clearly applies to all marital litigants and the children at issue.  Further, as disclosed by Unicare's own records, Mr. and Mrs. Pamphile were separated, but not divorced.  Therefore, the likelihood of litigation was apparent.  That, alone, should be sufficient notice to warrant some reasonable inquiry, as discussed further, below.

As to identity and contact information, Unicare's own records,  already contained that information, and did so accurately, *Ex. 10*.  Unicare's benefits records carried both the names and the addresses of Mrs. Pamphile and their children, *Id.*; nor has Unicare complained on that

basis, nor on the basis of inadequate or incomplete notice.

As set out by the order, were Mr. Pamphile to die before dissolution of the marriage, life insurance that then existed for the benefit of his wife or children, was then to be paid out to them, and to them, alone. The amount was to be that amount he had already designated for each such  beneficiary/ies, if any; and all  as appeared in the records of Unicare at the time the divorce was filed (all to his widow, *Ex. 10)*.  The number of payments or time period of payments is also answered by the order: it was to be paid in the event of Mr. Pamphile's death  during divorce proceedings, all unless and until the court ordered otherwise during the marriage and during divorce proceedings, if it did.  Although the order provided protection for the final property and support terms of any judgment, it also provided protection in advance of any such determination, in the event of death prior to judgment, *i.e.* to secure financial court orders, or their alternative, voluntary financial support and contributions, *see Facts. Nos. 14, 15.*

### *C. Although Not Specific in its Language, the Statewide Order Clearly Provided an Unambiguous Order  Sufficiently Specific to Warrant Enforcement as a QDRO*

While its terms clearly and specifically apply without any ambiguity,  the statewide order does not, by its text, specifically identify parties, addresses, or particular life insurance policies. Still, the absence of specific expression in the order should not defeat its exemption, protection, and enforcement under *29 U.S.C. §§ 1056(d)(3)(B)(i) and (ii).*   As suggested by the reasoning found in *Sun Life Assurance Co. of Canada v. Sullivan et als, 206 F. Supp. 2d 191, 197 (2002),* citing *Metro. Life Ins. Co.  v. Marsh, 119 F.3d 415, 420 (6 Cir., 1997) and Metro. Life Ins. Co. 42 F.3d 1080, 1084 (7th Cir.1994)" v. Wheaton, 42 F.3d 1080, 1084 (7th Cir.1994),* the purpose of the section is to assure that orders will not qualify if they are ambiguous.  If the order is not ambiguous, then the ambiguity standard suggested in the 6th and 7th circuits should be applied in

8

this circuit to the statewide order. Indeed, as a blanket order, it could not be more specific. Therefore, it should merit enforcement by this court, and be recognized to qualify as a QDRO under *ERISA's* specification requirements. These 6th and 7th circuit authorities construed unambiguous language that did not provide specific employer names, policy numbers, group plan company or identification numbers. So too, Massachusetts' statewide order is equally specific and clear: it applies to *all* life insurance policies existing at the time of filing the divorce complaint. Just as the policy references considered in *Sun Life* and *Metro Life,* the reference in the statewide Massachusetts order can be easily identified for each litigant, and with minium administrative effort. By its terms, the Massachusetts order leaves no place or space for any ambiguity concerning to which life insurance policies it apples. It applies to all. By its terms, there can be no exception, and therefore, no ambiguity. It applies to all policies existing at the time of the entry of the order. An administrator need merely check marital status, and if a divorce is pending, request the filing date and flag the beneficiary status for that date.

### *D. The Statewide Order is Self-Restricted as Required by ERISA to Qualify as a QDRO*

To warrant or merit enforcement by this court, the statewide order must pertain to marital issues expressly reserved to the states *29 U.S.C. §§ 1056(d)(3)(B)(i)(I); (see Boggs, above)*. Exemption depends upon the order relating to "the provision of child support, alimony payments, or marital property rights to a spouse, former spouse, child, or other dependent of a participant" as long as it is pursuant to State domestic relations law *§§ 1056(d)(3)(B)(ii)*. *Boggs* clearly explains that such an order may be exempt from anti-alienation under *§§ 1056(d)(3)(A),* or even ERISA's general preemption clause, all as long as the order meets the QDRO requirements set out in *§§1056(d)(3)(C)-(E).*, *See discussion* in *Kentucky Ass'n. of Health Plans,*

*Inc. v. Miller, (2003.);* in *Southeast & Southwest Areas Pension Fund v. Howell et als, 2000*

*FED App 0336P,* and in *Metropolitan Life Co. v Marsh, ELECTRONIC CITATION: 1997 FED*

*App. 0212P (6th Cir.)* construing *§§ 1056(d)(3)(B)(ii):*

> (B)(ii) the term "domestic relations order" means any judgment, decree, or order (including approval of a property settlement agreement) which -
>
>> (I) relates to the provision of child support, alimony payments, or marital property rights to a spouse, former spouse, child or other dependent of a participant, and
>>
>> (II) is made pursuant to a State domestic relations law (including a community property law)

particularly where the state law is well established. Here, the order relates to life insurance

directly, as well as to child support, alimony, and marital property rights, with life insurance a

component of such maintenance and support. Here, life insurance is to serve as security to

protect case-specific economic plans for spouse and child dependents. *MGL. c.208 s. 28, 36,*

*MGL. c. 176 s. 126 ; Freedman v. Freedman (2000) 730N.E.2d 913, 49 Mass.App.Ct. 519, rev.*

*den. 737 N.E.2d 468, 432 Mass. 1109.* (See also *Hurlbot v. Hurlbot 40 Mass.App.Ct. 521*

*(1996),* enforcing life insurance as security for a voluntary economic plan?

The statewide order both depends on, and shelters, *M.G.L. c. 208 (ss. 28, 34 and 36),* the

state's primary divorce statute, *M.G.L. c. 209 (*applicable to marriage*),* and *M.G.L. c. 175 s. 126*

*(*applicable to insurance and wives*)* as well as *R. 411.* It is directed to protect three kinds of

court orders: existing, potential, and final orders of child support, alimony, pension assignments,

and property division. *Ergo,* since it provides security for maintenance and support, it also

merits enforcement just as garnishment is enforced, *see Southeast & Southwest Areas Pension*

*Fund v. Howell et als, 2000 FED App 0336 citing Mackey v. Lanier Collection Agency and*

*Serv., Inc., 486 U.S. 825, 831-2 (1988).* This statewide order may be viewed as no more than an

10

appropriately narrow order undertaken to prevent circumstances similar to those in which

otherwise, garnishment could become necessary or permitted, *i.e.* in the event the obligated

payor does not pay. *Quaere* where garnishment is permitted during an obligor's lifetime,

shouldn't security should be similarly enforced in the event of the obligor's death?

### E.    The Statewide Order may also Merit Saving as Insurance Regulation

Under *29 U.S.C.* s. *1144 (B) (2)(a)* the statewide order may also meet the requirements to

be saved as a law which regulates insurance.   *Kentucky Ass'n. of Health Plans, Inc. v. Miller,*

*538 U.S. 329, 342 (2003)* sets out a two-prong test:

> To be deemed a "law...which regulates insurance" under *s. 1144(B)(2)(a)*, it must satisfy
> two requirements.  First, the state law must be specifically directed toward entities
> engaged in insurance... . Second...the state law must substantially affect the risk pooling
> arrangement between the insurer and the insured.

The instant order is directed at all existing life insurance policy products provided for, or sold to,

marital litigants. Sale may be by insurance companies, or at least as to supplementary insurance,

by employers standing almost as sales agents.   As such, the order is clearly directed to entities

engaged in insurance.   As a public record, the orders should bind those who have timely and

actual notice of it, or who are given notice of it, upon service, *i.e.* insurance companies, at least

to the extent that it serves as a notice of claim; and employer-benefits administrators. (As to

either entity form, under common law principles, liability could and would continue to

dependent upon notice; and be likely to continue to result in interpleader actions.)

As to the second prong of the test set out in *Kentucky,* the order directly affects the risk

pool.  It does so by restraining litigants from either terminating or lowering coverage for named

beneficiaries who are spouses or children of the marriage.   In addition, the order directly, if not

expressly, encourages the purchase of additional insurance to accommodate intended additional beneficiaries who might otherwise have been covered by a simple change of beneficiaries, due to that being unpermitted under the order.

The order does not seek to regulate any welfare benefit plan, *per se.*  It only seeks to regulate the distribution of benefits of already-purchased and/or already-provided life insurance products, independent of the identity or legal nature of the purchaser.  It also seeks to regulate the marital litigation conduct of marital litigants, in the court's exercise of it judicial duties and powers of superintendence of its court, using its sound discretion to manage and administer the probate court and the litigants before it.  *M.G.L. c. 211 B, c. 217. s. 8.*  Without the security provided by existing life insurance, there may be no security for the economic plan finally determined by the probate court for its marital litigants, and with Mr. Pamphile's death, it is too late for garnishment.

### *F. Federal Common Law is Still Developing.*

Federal common law is still developing as to *ERISA*.  In context of a developing common law, the variations presented in this matter should not defeat enforcement of the statewide state law, particularly one that has such widespread significance to the economic safety of dependents who find themselves marital litigants, and to their dependent children.  Being mindful of the underlying interests and issues which pertain to the uniformity of administrative functioning on the part of employee welfare plan administrators, there should be a point of balance where both goals can be reasonably achieved, reasonably protecting the interests of the population protected by the statewide order, and reasonably protecting purely ministerial functions and its advantageous economic sequelae.

Whether these should be balanced, and how they may be balanced, was considered by this court in *Metropolitan Life Insurance Company v. Flinkstrom, Civil Action No. 02-12309-JLT (D. Mass. 2/17/2004) (D. Mass., 2004) at footnotes nos. 65-67.*  This court cited and quoted both *Estate of Altobelli v. International Business Machines Corp., 77 F.3d 78 (C.A.4 (Md.), 1996) at 81,* and *Fox Valley & Vicinity Constr. Workers Pension Fund v. Brown, 897 F.2d 275, 280-82 (7th Cir. 1990) at 282,* suggesting that where the issues are protection of ministerial function *versus* protection of substantial individual interests and rights:

> ...“...federal courts are charged with creating federal common law rules to govern ERISA... . ...,  and the creation of such federal rules provide[s] the needed uniformity.”[65] And second, the majority approach will not impose additional burdens on plan administrators. Currently, “under the ERISA statutory scheme, a plan administrator must investigate the marital history of a participant and determine whether any domestic relations orders exist that could affect the distribution of benefits.”[66] The majority approach “only requires plan administrators to continue their current practice of thoroughly investigating the marital status of a participant.”[67]

Given the equities, and matters of substantial justice, a similar standard should apply in the case at bar.  Enforcement of the statewide order would require no more on the part of plan administrators than to perform that same current practice of thoroughly investigating the marital status of a participant-employee.

In the instant case, little accommodation is necessary.  The employee's beneficiary change form, itself, stated he was separated. *Ex. 14*  Before distribution, the administrator received actual notice of the applicable domestic relations order. *Ex. 15* .  Therefore, a favorable outcome in this case for Mrs. Pamphile and her children could well be crafted in a narrow terms. Such terms would impose no substantial or substantially increased burden on an benefits administrator.  It could well be crafted in a way which is limited to actual notice, satisfied by a minor change on the beneficiary change form, specifically asking whether such a restraining

order had issued.  As observed by this court in *Metropolitan,* at 282,  there are, indeed, already

circumstances where plan administrators are required to consult documents outside of plan

documents, including divorce decrees.  Limiting relief to circumstances where there is actual

notice would not significantly broaden an administrator's duties, nor would permitting the

administrator to rely upon an employee's disclosure be overreaching under such circumstances.

*7.   In any event, If Either of the Last Two Beneficiary Designations is Enforced under ERISA,*
*the Court May and Should Impose and Instantaneous Constructive Trust, as a matter of Equity*

In the matter before the court in *Southeast & Southwest Areas Pension Fund v. Howell et*

*als, 2000 FED App 0336,* there were no cognizable domestic relations orders which fulfilled the

requirements of *ERISA's* exception.  However, the court went on to apply a constructive trust to

direct the distribution of life insurance proceeds.  In so doing, the court held that

> It is clear that the law of this Circuit requires the ERISA plan administrator to pay out
> plan proceeds in accordance with the ERISA plan documents. However, there is no
> precedent binding on this Court on the issue of whether, once the beneficiary is
> determined, ERISA preempts all causes of action and possible remedies based upon
> state law that might be traced to the ERISA plan proceeds. *See Hendon*, No. 96-6233,
> 1998 WL 199824 (6th Cir. Apr. 13, 1998) (unpublished decision holding that state law
> breach of contract and conversion claims were preempted); *see also Pressley v.*
> *Metropolitan Life Ins. Co*., 729 F.Supp. 570, 572 (E.D. Mich. 1990) (district court
> decision holding that "state law claim based upon an alleged constructive trust is
> preempted by ERISA.").

> The U.S. Supreme Court held that the benefits in an ERISA employee welfare benefit
> plan can be subject to state garnishment proceedings. *See Mackey v. Lanier Collection*
> *Agency and Serv., Inc.,* 486 U.S. 825, 831-2 (1988)(". . . Congress did not intend to
> forbid the use of state-law mechanisms of executing judgments against ERISA welfare
> benefit plans, even when those mechanisms prevent plan participants from receiving
> their benefits.") When the Supreme Court considered the propriety of allowing a state
> to impose a constructive trust upon ERISA-plan benefits, the Court stated, "We see no
> meaningful distinction between a writ of garnishment and the constructive trust
> remedy imposed in this case." *See Guidry v. Sheet Metal Workers Nat'l Pension Fund*,
> 493 U.S. 365, 372 (1990). However, the High Court distinguished between ERISA's
> anti-alienation provision governing employee welfare benefit plans, such as the one

presented in *Mackey*, and the provision governing pension plans, such as the one presented in *Guidry*. On that distinction, the Court concluded that a constructive trust could not be imposed against an ERISA *pension* plan. *See Guidry*, 493 U.S. at 371-72.

On remand from the Supreme Court, the Tenth Circuit considered whether a constructive trust could be imposed upon ERISA pension plan benefits *after* they had been distributed to the beneficiary. *See Guidry v. Sheet Metal Workers Nat'l Pension Fund*, 39 F.3d 1078, 1081-83 (10th Cir. 1994) (*en banc* decision after remand from the U.S. Supreme Court, *Guidry,* 493 U.S. at 365). The Tenth Circuit recognized that the anti-alienation provision of ERISA precluded the imposition of a constructive trust *before* distribution of benefits to the beneficiary, but it held that nothing in the legislative scheme prevented the imposition of a constructive trust *after* the benefits were paid to the beneficiary of the pension benefits. *See id.* at 1086. We find the Tenth Circuit's reasoning persuasive. Today, we hold that once the benefits of an ERISA employee welfare benefit plan have been distributed according to the plan documents, ERISA does not preempt the imposition of a constructive trust on those benefits. ...we hold today that once the benefits have been released to the properly designated beneficiary, the district court has the discretion to impose a constructive trust upon those benefits in accordance with applicable state law if equity so requires.

Mrs. Pamphile respectfully suggests that life insurance benefits should be similarly considered, with the issue of equity driven by state law, *Southeast; see also Sweebe v. Sweebe, 712 N.W.2d 708, 474 Mich. 151 (Mich., 2006)* where that court ruled that once the proceeds have been distributed to a named beneficiary, state law takes over

. Under Massachusetts state law, it is well established that a constructive trust would be applied by the state court:

"...[3] There is no dispute that a spouse who has been removed as a beneficiary of a life insurance policy in violation of the terms of a separation agreement is entitled to recover the proceeds of that policy either from the improperly substituted beneficiary or from the insurer." *Hurlbot v. Hurlbot, 40 Mass. App. Ct. 521,* 526; *665 N.E.2d 1018 (1996)* quoting *Green v. Green, 13 Mass.App.Ct. 340, 342, 433 N.E.2d 92 (1982).*

Under *Foster v. Hurley 444 Mass. 157, 826 N.E. 2nd (2005)* the state court substituted the surviving spouse as the beneficiary rather than the more recently designated beneficiary, a new spouse, all based upon the equities, where the life insurance was required and intended to benefit

the parties' children, was provided for in a voluntary marital agreement, and existed at a relevant time. See also Dissent of Justice Greaney to that, arguing that later-acquired insurance should also be held as security for the obligations set forth in the marital agreement and the judgment. If equity merits such enforcement in the event of voluntary agreements, enforcement should be warranted in the event of a court's injunction, thereby also securing voluntary financial support.

### 8. Irrespective of ERISA Issues, Both 2005 Beneficiary Designations Should be Set Aside based upon Decedent's Incompetency or Incapacity

The stakeholder has presented a history of four separate beneficiary designations. The first designated Mr. Pamphile's wife as the beneficiary. The second designated his children as beneficiaries.[1] The next two beneficiary changes were on March 10, 2005, *Ex. 11,* and ten days later, on March 20, 2005, *Ex. 14*. *Ex. 11* appears irregular on its face, *Facts Nos. 23 - 28* and is not on an approved form. Regarding the March 20, 2005 change form, *Ex. 14, Facts No. 29,* the Benefits Log, *Ex. 16,* recites a claim that the decedent went to the benefits office on March 20, 2005 to complete it. Both presume competency and/or physical capacity. However, Mr. Pamphile's medical records strongly demonstrate otherwise.

Mr. Pamphile was initially seen at Brigham and Women's Hospital on October 20, 2004. *Exs. 5,8.* On November 4, 2004, a diagnostic test suggested he might have "T-cell" lymphoma. *Ex. 5* Several hospitalizations followed through February 6, 2005. Each time, he was discharged to home as stable. *Exs. 5-7.* .

---

[1] There is a substantial issue concerning Mr Pamphile's competency as early as 2004. That is related to his possibly suffering encephalopathy due to the T-cell carcinoma and its typical course and features, possibly resulting in paranoia in some form, all long before he was formally diagnosed with T-cell carcinoma (and due to its typical features), including around the time of the 2004 beneficiary change form, and around the time he claimed threats and abuse on the part of his Wife. However, these issues need not be considered, given the legal issues, and the fact that Mrs. Pamphile would not oppose award of life insurance to her children under a constructive trust theory, alone.

One month later, on March 7, 2005, Mr. Pamphile was again admitted to Brigham and Women's Hospital.  This time,  he was found to suffer "altered mental status" and "diffuse encephalopathy," *Ex. 8.*  The Final Discharge Summary Report,  *Id.,*  recites

> Over a few days prior to admission, Mr. Pamphile's mental status had been declining.  He had become more confused and lethargic with bilateral lower extremity weakness.  He also developed tremors and generalized twitching, was unable to ambulate without assistance....

Upon examination,

> [in the emergency department] he was found to be disoriented, confused, and encephalopathic and was unable to cooperate with history. *Id.*

In the course of his next physical examination upon admission, he was

> extremely ill-appearing, lethargic, unable to be sufficiently aroused and cooperative with his physical exam ... He was witnessed by staff at times to exhibit myoclonic jerking movements.  *Id.*

 He was so incapacitated and/or incompetent that

> decision was made in conjunction with the patient's healthcare proxy to discontinue further aggressive chemotherapy options. *Id.*

Even at discharge on March 15, 2005,

> He cleared somewhat after getting Decaderon and run of hemodialysis and remained markedly clear though not fully *compos mentis* at the time of discharge. Most likely it was considered a temporary improvement in the setting of his steroid use and CNS disease.

with no neurologic medications sent home beyond a sleeping pill. Id but a warning at *par. 8*:

> The patient was extremely agitated, early in his course, demonstrating physically defensive behavior consistent with paranoid ideation at times.   He was given Haldol with good relief of his apparent delirium and agitation.  At the time of discharge, he was much clear *[sic]* and less agitated, but we will give him a prescription for Haldol as needed given the potential for further agitation as his neoplastic process is likely to recur.

 Presumably on the basis of having met the statutory requirements of *M.G.L. c. 201D,*

"Code status at the time of discharge is do not resuscitate and do not intubate per the patient's healthcare proxy, his girlfriend, Shantelle." *Id.*   Mr. Pamphile was sufficiently incompetent

17

between March 7, 2005 and March 15, 2005 for Brigham and Women's Hospital to activate his healthcare proxy, and to rely upon his healthcare proxy, alone. Therefore, Mr. Pamphile was determined to be either legally incompetent, or its substantial equivalent.

At discharge, Mr. Pamphile was diagnosed as continuing to be not *compos mentis, Id.* In short, and based on the definition of *compos mentis* in the Merriam Webster on-line dictionary, Mr. Pamphile was medically and psychiatrically determined to lack sound mind, memory, and understanding. His prognosis expressly excluded much hope for improvement, and indeed, medications were prescribed based upon anticipated decline. Based on these records, at discharge, he was able to walk 100 feet with a cane and a person standing by (Col p. 7). While he was "near independent." *id* and alert and oriented (A+Ox3), he had a recent history of complete disorientation and being responsive only to pain ("A+Ox0)[1], *Ex. 9 p. 8.* Mr. Pamphile was admitted to a nursing home on March 21, 2005, after "rapidly declining for several days..." *Ex.9, p. 8* requiring 24 at-home care by his girlfriend, *Id., p. 19,* and "by March 21, was observed to be non-verbal, twitching, confused, and somnolent," *Ex. 9, p.19-20.*" He came " in by stretcher," was non-weight bearing, was unable to walk, and was in a non-responsive state, of stupor, was immobile, and in a coma, *Id., p. 7-9.* With a rapid decline being identified as taking place over "several days," it is clear that Mr. Pamphile's mental competency had also declined over that same several days. *Ergo,* his level of competency, diagnosed as remaining *non compos mentis* March 15th, was even more profound by the date of the second alleged

---

[1](pg. 11 col, also recites an alleged threat by Mrs. Pamphile to kill her husband, a restraining order, and a restraining order against her in favor of Chantalle Phanor. While a 209A order did enter against her in favor of her Husband, she will now seek to have it set aside based on the full medical record. She has never been served with any application for any order in favor of her husband's girlfriend and knows of no such order.

beneficiary change on March 20.      The benefit office record suggests that Mr. Pamphile

traveled to the benefits office to make the beneficiary change.  While the issue pales in the

context of diagnosed incompetency, the medical records show he was not physically capable of

doing so, as recited above.  It simply strains credulity to consider him able to walk into an office

just one day preceding his coma, having declined over several days, and having required such

intense 24-hour care by his girlfriend at home, *Id., p. 19,*  that she, herself, was exhausted.

Further, regarding such issues, the nursing record for March 23, 2005 recites a statement by

Defendant Chantal Phanor: Mr. Pamphile had called the benefits office and a lawyer on March

18, 2005, *Ex. 9 p. 22,* as recited in the benefits office log, *Ex. 16.*  However, as his primary

caretaker who was exhausted by his need of 24-hour care, she made no mention of his traveling

from her home to Boston to the benefits office the day before his admission for end-of-life

care(in Boston), to say nothing of delirium and encephalopathy reported in the medical record,

*Exs. 8,9.*

        Even before all this, competency proves to be an issue.   Notwithstanding that, Mr.

Pamphile and his older children maintained close relationships, and in his last hospital days,

their visits brightened him.  Yet, after discharge, they could not reach him by phone, and didn't

see him again. *Affidavit of Jeffrey Pamphile, pars. 13-15; Affiavit of Judy Pamphile, pars. 14-16.*

        Whether or not the statewide order is saved under any *ERISA* QDRO or insurance

exception, the medical facts of incompetency and incapacity the March 10, 2005 and March 20,

2005 change of beneficiary designations beg to be set aside.  Further, whether Mr. Pamphile,

himself, ever directed such beneficiary changes is very much disputed, and at issue.  It would

have been inconsistent with his relationship with his children, and his voluntary financial support

of their educations.  It would have been inconsistent with documented and observed incapacities and incompetence on both March 10, 2005 and March 20, 2005.  If he even knew of them, he was  too incompetent and too incapacitated to know their meaning or consequences.  A constructive trust is warranted.   However, even had he been competent and had he, himself, directed the changes, he would have been in contempt of the state court.  Therefore, and again, the outcome should be the same: the imposition of a constructive trust.

For any and all of the reasons stated above, this court should grant summary judgment as prayed for to Ruth Pamphile or her children, and enter such orders as will assure that the life insurance proceeds are paid out accordingly, to her or her children, either directly under *ERISA*, or otherwise, by way of a constructive trust.

By Counsel,

/s/ *Alanna G. Cline*

Alanna G. Cline
BBO 086860
300 Market St.
Brighton, MA 02135
July 31, 2006                                         617 783 5997

.

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

Civil Action 05-11355 JLT

_____

UNICARE LIFE & HEALTH INSURANCE CO.
        Plaintiff-Stakeholder

v.

CHANTAL PHANOR, RUTH PAMPHILE,
BEVERLY PAMPHILE, SONIA PAMPHILE,
WIDLENE CESAR, JUDY PAMPHILE,
JEFFREY PAMPHILE, BRUNEL PAMPHILE
AND CARTWRIGHT FUNERAL HOME
        Defendants

_____

EXHIBITS TO MEMORANDUM IN SUPPORT OF WIDOW AND CHILDREN'S MOTION
FOR  SUMMARY JUDGMENT

1.    Mr. Pamphile's divorce complaint

2.    Massachusetts' Statewide Automatic Restraining Order

3.    Appointment of Mrs. Pamphile as Voluntary Administrator (Norfolk Probate Court).

4.    Mr. Pamphile's Personal Accounting of Net Refinance Proceeds

5.    Brigham and Women's Hospital Final Discharge Summary Report dated 1/10/05

6.    Brigham and Women's Hospital Discharge Summary dated 1/19/05

7.    Brigham and Women's Hospital Discharge Summary dated 2/6/05

8.    Brigham and Women's Hospital Final Discharge Summary Report dated 3/15/05

9.      Nursing Home Care Record March 21 - 23, 2005

10.     Unicare Beneficiary History Record

11.     Written Beneficiary Change Request and Related E-mail for March 10, 2005

12.     Death Certificate

13.     Excerpt of Life Insurance Policy Definitions re: Spouse/Dependent

14.     Life Insurance Policy Beneficiary Change Form dated March 20, 2005.

15.     Notice by Counsel to Unicare of Statewide Restraining Order

16.     Benefits Office Log

Division

Commonwealth of Massachusetts
The Trial Court
Probate and Family Court Department

Docket No. _____

## Complaint For Divorce

JOSEPH PAMPHILE
_____ ; Plaintiff

v.

RUTH DEMOSTHENES PAMPHILE
_____ , Defendant

Plaintiff, who resides at  1751 Washington Street     Braintree     Norfolk     Ma     02184
                            (Street and No.)          (City or Town)   (County)   (State)    (zip)

was lawfully married to the defendant who now resides at   27 Seymour Street
                                                           (Street and No.)

Roslindale                              Suffolk        Ma     02131
(City or Town)                          (County)      (State)   (zip)

The parties were married at  Boston, MA _____ on  March 8, 1984
and last lived together at  Roslindale, MA _____ on  May 30, 2001

The minor _____ of this marriage, and dates of birth are

Beverly Pamphile _____ d.o.b. 3/20/84     Brunel Joseph Pamphile _____ d.o.b. 6/22/00

Judy Shirley Pamphile _____ d.o.b. 2/2/86   _____

Jeffrey Rudolph Pamphile _____ d.o.b. .5/25/88  _____

Plaintiff certifies that no previous action for divorce, annulling or affirming marriage, separate support, desertion, living apart for justifiable cause, or custody of  children  has been brought by either party against the other except:

None

On or about  May 30 _____  2001 _____
there occurred an irretrievable breakdown of the parties' marriage that continues to exist to this
date.

Therefore, plaintiff requests that the Court:

grant a divorce for  irretrievable breakdown pursuant to G.L. c. 208, sec. 1B

prohibit defendant from imposing any restraint on plaintiff's personal liberty

grant _____ custody of the above-named

order a suitable amount for support of the

order conveyance of the real estate located at  27 Seymour Street, Roslindale, Ma

_____ standing in the name of  JOSEPH PAMPHILE and

RUTH DEMOSTHENES PAMPHILE _____ as recorded with _____

Registry of Deeds, Book  21238 _____ Page 289, 290 _____

allow plaintiff to resume her former name of _____

grant an equitable division of the marital estate pursuant to G.L. c. 208, sec. 34 and any other relief

this court deems necessary and just.

Date  10/30/01 _____

_____
Signature of Attorney or Plaintiff, if pro se
Print name and address  Lisa M. Wilson,  Esq.

Wilson, Marino & Bonnevie, 288 Walnut Street

Newton, _____ Ma _____ 02460

Tel. No. ( 617 ) 964 - 8090  B.B.O. # 552844

c.g.f.

Commonwealth of Massachusetts
The Trial Court
Probate and Family Court Department

Supplemental Probate Court Rule 411. Automatic Restraining Order

Notice to Plaintiff

(a) The following automatic restraining order shall apply to both parties to a complaint for divorce or separate support. This automatic restraining order shall be effective with regard to the plaintiff upon the filing of the complaint by the plaintiff or the plaintiff's counsel and with regard to the defendant upon service of the summons and complaint or any other acceptance of service by the defendant.

After service of the complaint for divorce or separate support, on two (2) days' notice to the other party or on such shorter notice as the court may prescribe, a party may appear without thereby submitting his person to the jurisdiction of the court, and move to modify or dissolve the automatic restraining order and in that event the court shall proceed to hear and determine such motion as expeditiously as the ends of justice require.

This order is in effect until the earliest of the following: (1)the order is modified or dissolved by the court; (2)the order is modified by a written agreement of the parties with court approval; (3)the entry of a judgment of divorce or separate support; (4)the action is dismissed; or (5)by further order of the court. FAILURE TO COMPLY WITH THIS ORDER MAY BE DEEMED A CONTEMPT OF COURT.

The following order PROHIBITS either party to a complaint for divorce or separate support from:

(1) Selling, transferring, encumbering, concealing, assigning, removing or in any way disposing of any property, real or personal, belonging to or acquired by, either party, except: (a) as required for reasonable expenses of living; (b) in the ordinary and usual course of business; (c) in the ordinary and usual course of investing; (d) for payment of reasonable attorney's fees and costs in connection with the action; (e) by written agreement of both parties; or (f) by Order of the Court.

(2) Incurring any further debts that would burden the credit of the other party, including but not limited to further borrowing against any credit line secured by the marital residence or unreasonably using credit cards or cash advances against credit or bank cards;

(3) Directly or indirectly changing the beneficiary of any life insurance policy, pension or retirement plan, or pension or retirement investment account, except with the written consent of the other party or by Order of the Court.

(4) Directly or indirectly causing the other party or the minor child(ren) to be removed from coverage under an existing insurance policy or permitting such coverage to lapse, including medical, dental, life, automobile, and disability insurance. The parties shall maintain all insurance coverage in full force and effect.

(b) The provisions contained in the new summons for divorce or separate support must be served on the defendant, except if personal service is not made as provided in Rule 4 and service is made by publication, said notice shall include a statement that an automatic restraining order has been issued pursuant to this rule. The provisions of this automatic restraining order need not be reprinted in said public notice.

Date Rule Effective: January 1, 2000

CJ-D 1106 (01/00)

Chief Justice

**Commonwealth of Massachusetts**
**The Trial Court**

NORFOLK Division    Probate and Family Court Department    Docket No. 04P1841VA

## Voluntary Administration

Name of Decedent  Joseph Pamphile

Domicile at Death  1751 Washington St No 6. Braintree Norfolk 02184
(Street and No.)    (City or Town)    (County)    (Zip)

Date of Death  March 23, 2005

**Death Certificate shall be filed with application.**

Name and address of Applicant(s)  Ruth (Demosthenes) Pamphile
29 Seymour St #1 Roslindale Ma    Status Widow
02121

Your applicant(s) respectfully state(s) that said estate consisting entirely of personal property the total value of which does not exceed fifteen thousand dollars ($15,000) exclusive of the decedent's automobile as shown by the following schedule of all the assets of said deceased known to the applicant(s):

| Name of Property | Estimated Value |
|---|---|
| miscellaneous personalty | $ 100.00 |
| medical records | $ nominal |
| 97 Toyota Forrunner | $ |
| (VIN J13HN87E9V9003FF2 | $ (no known equity) * |
| * loan and equity information not yet available | $ |
| Total | $ 100.00 |

That thirty days have expired since the date of death of said deceased and no petition for probate of will or appointment of administrator/administratrix has been filed in said Court.

That your applicant(s) ha____ undertaken to act as voluntary administrator/administratrix of the estate of said deceased and will administer the same according to law and apply the proceeds thereof in conformity with Section 16 of Chapter 195 of the General Laws.

That to the knowledge of the applicant(s) the following are the names and addresses of all persons surviving who, with the deceased, were joint owners of property: also listed are the names and addresses of those who would take under the provisions of Section 3 of Chapter 190 in the case of intestacy.

Beverly Pamphile
Judy Pamphile     } 29 Seymour St #1 Roslindale Ma 02131
Jeffrey Pamphile  }
Daniel Pamphile

☐ The applicant(s) hereby certif____ that a copy of this document, along with a copy of the decedent's death certificate has been sent by <u>certified mail</u> to the **Division of Medical Assistance, P.O. Box 15205, Worcester, Massachusetts 01615-9906.**

Date July 27, 2006    Signature(s)  Ruth Pamphile
RUTH PAMPHILE

### NOTARIZATION

Norfolk , ss.    Date 7-27-06 , 20____

Then personally appeared Ruth (Demosthenes) Pamphile
to me known and made oath that the information contained in the foregoing statement is true to the best of his/her/ their knowledge and belief.

Before me, Alanna G. Cline, N.P
[NOTARY PUBLIC/JUSTICE OF THE PEACE]

My Commission expires 8-27-10

I, the undersigned, HEREBY CERTIFY, that I am the Register of Probate of the Norfolk County Division, of the Trial Court Department, Commonwealth of Massachusetts; that as such I have custody of the records of said Court; and I do FURTHER CERTIFY that the foregoing is a photographic copy of a Voluntary Administration - Executor and that said applicant is duly authorized to act as said Voluntary Administrator - Executor, and that said authority remains in full force and effect.

WITNESS, my hand seal of the Probate and Family Court Department of the Commonwealth of Massachusetts at Dedham.

Patrick W. McDermott
Register of Probate
Norfolk Division

JOSEPH PAMPHILE
PO BOX 453
JAMAICA PLAIN MA 32130

DETAIL OF EXPENDITURES FOR REFINANCE AMOUNT OF 58,600.00

STARTIND BALANCE...............................58,600.00

PAYMENTS

NSTAR-------------------------------------------------660.20
HOME DEPOT..........................................407.79
WATER RESOURCES..................................637.74
SAFETY....CAR  INSURANCE PAYMENT...........917.00
HOME TELEPHONE...................................179.45
FILENE FOR JOSEPH................................ 250.00
FILENE FOR RUTH....................................185.64
KEYSPAN(GAS CO).................................1484.77
CHASE..MASTER CARD...............................1400.00
BEST BUY................................................977.44
VISA CREDIT CARD...................................2978.37
DISCOVER.............................................9150.00
PAYMENT TO NCDS(BEVERLY..........................1600.00
NCDS(DONATION.....................................100.00
KEYSPAN.............................................42.21
TO RENT NEW PLACE...................................3000.00
TO BUY FURNITURE.................................. 2500.00
CABLEVISION..........................................250.00
BEST BUY................................................89.58
TO TEST THE KIDS...................................1200.00
TO FIX PORCHES.....................................12000.00
WINDOWS.............................................2000.00
DIVORCE..............................................3500.00
BEAVER FOR JUDY.....................................666.38
BEAVER FOR JEFFREY................................536.38
DISCOVER.............................................1500.00
SCHOOL CLOTHES FOR KIDS SCHOOL................500.00
PLUMBING SYSTEM...................................5000.00
MASS BAY COUNSELING.............................. 50.00
BUY 2  REFRIGERATORS............................. 1150.00
OPEN ESCRO ACCTS FOR TENANTS.................... 2650.00
RUTH TRAVEL TO FLORIDA............................. 600.00
PAYMENTS FOR KIDS BOOKS...2000-2001.................1500.00
PAYMENT TO BALLY'S FOR 3 YEARS....................1500.00
4 MONTHS PAYMENTS FOR MY CAR.....................2141.40
SEARS....................................................500.00
BRADLESS................................................450.00
FULTON BED FOR JEFFREY------------------------------250.00

TOTAL_____  $  64504.35

BRIGHAM AND WOMENS' HOSPITAL                    PAGE  1 of  5
75 FRANCIS ST., BOSTON, MA 02115          086 31 64 0
ADM DATE: 12/29/04                        (DFCI) 321989
DIS DATE: 01/10/05                        PAMPHILE,JOSEPH
ATTENDING DR:  FREEDMAN,ARNOLD S.,M.D.    DOB: 01/26/58  M

               *FINAL DISCHARGE SUMMARY REPORT*
------------------------------------------------------------------

ATTENDING: ARNOLD STEPHEN FREEDMAN MD


PRIMARY DIAGNOSIS:
T-cell lymphoma.

SECONDARY DIAGNOSES:
Renal failure, hypercalcemia,

HISTORY OF PRESENT ILLNESS:
This is a 46-year-old gentleman with no significant past medical
history who presented with inguinal adenopathy as well as
weakness.  In 10/04, the patient presented with inguinal
adenopathy along with night sweats and anorexia.  The patient was
seen in the Brigham and Women's Emergency Department on 10/20/04.
He was scheduled for surgery followup for excisional lymph node
biopsy.  The patient had a negative workup for infectious
etiologies of adenopathy including EBV, CMV, and HIV.  However,
he missed his excisional biopsy appointment secondary to
apprehension about the procedure.  The patient was then lost to
follow up.  The patient then returned on the day of admission to
the emergency room after a two-week trip to Haiti complaining of
fatigue, diffuse adenopathy, and one episode of nonbloody nausea
and vomiting.  In addition, he reported thirst, polyuria,
constipation, and anorexia.  Of note, the patient had flow
cytometry in 11/04 concerning for T-cell lymphoma.  The patient
denied cough, shortness of breath, chest pain, dysuria, flank
pain, hematuria, or abdominal pain.  In the emergency room, the
patient received milk of magnesia and Phenergan.  He had a
calcium of 16.9 and received 2 liters of normal saline.


PAST MEDICAL HISTORY:
1.  Question of neurocysticercosis.
2.  Nasopalatine cyst status post resection in 2001.
3.  History of positive PPD never treated.
4.  Borderline hypertension.

MEDICATIONS:
None.

ALLERGIES:
No known drug allergies.

SOCIAL HISTORY:

BRIGHAM AND WOMENS' HOSPITAL                      PAGE  2 of 5
75 FRANCIS ST., BOSTON, MA 02115            086 31 64 0
ADM DATE:  12/29/04                         (DFCI) 321989
DIS DATE:  01/10/05                         PAMPHILE,JOSEPH
ATTENDING DR:  FREEDMAN,ARNOLD S.,M.D.      DOB:  01/26/58  M

                  *FINAL DISCHARGE SUMMARY REPORT*
------------------------------------------------------------------
The patient is from Haiti.  He has four children.  He is sexually
active with one partner for several years.  He quit smoking 20
years ago.  He has occasional alcohol.

FAMILY HISTORY:
The patient's father died of cancer of unknown type at age 65.

PHYSICAL EXAMINATION:
Temperature 96, pulse 103, blood pressure 164/61, respiratory
rate 18, O2 sat 99% on room air.  The patient was in no acute
distress.  He had dry mucous membranes.  He was anicteric.  Neck
was supple with large bilateral cervical and occipital
adenopathy.  Lymph nodes were hard and nontender.  Bilateral
axillae had hard, nontender adenopathy.  Lungs were clear to
auscultation bilaterally.  There was no CVA tenderness.  The
patient had a regular rate and rhythm with no murmurs, rub, or
gallops.  The patient had very large bilateral inguinal hard,
nontender adenopathy, left greater than right.  Extremities with
2+ right lower extremity pitting edema and 3+ left lower
extremity pitting edema.  Calves were nontender.  No cords.  He
had no rash.  The patient was somnolent but easily woke to voice.
 He was alert and oriented x3.

LABORATORY DATA:
Labs were remarkable for a BUN of 48 and a creatinine of 5.9,
calcium was 16.9, ionized calcium 2.09.  AST was 52, ALT 32, LDH
101, alkaline phosphatase 508, white blood cell count 31.1,
hematocrit 33.7, and platelets 473,000.  UA showed 2+ protein and
3+ blood.  No red blood cells.  No crystals.

STUDIES:
Flow cytometry 11/04/04 showed suspicion for T-cell lymphoma.
Abdominal CT 10/20/04 showed positive inguinal retroperitoneal
and mesenteric nodes.  Spleen was within normal limits.
Testicular ultrasound 10/20/04 showed a right epididymal cyst and
bilateral inguinal lymphadenopathy.  Chest x-ray showed question
of left mediastinal adenopathy.  KUB showed stool in rectum with
no dilated loops of bowel.  EKG showed normal sinus rhythm at 98,
normal axis, QTC 400, question of Q waves in II and aVF.

HOSPITAL COURSE BY SYSTEM:
1.  Renal/FEN:  The patient had renal failure with a creatinine
of 5.9 on admission.  The patient's creatinine rose initially and
peaked to 7.1.  His renal failure was thought likely to a
combination of a prerenal process, nonoliguric ATN, and
hypercalcemia.  The patient received aggressive intravenous

BRIGHAM AND WOMENS' HOSPITAL
75 FRANCIS ST., BOSTON, MA 02115                    PAGE  3 of  5
ADM DATE:  12/29/04                          086 31 64 0
DIS DATE:  01/10/05                          (DFCI) 321989
ATTENDING DR:  FREEDMAN,ARNOLD S.,M.D.       PAMPHILE,JOSEPH
                                             DOB:  01/26/58  M

                    *FINAL DISCHARGE SUMMARY REPORT*
-------------------------------------------------------------------
fluids as well as calcitonin and pamidronate to decrease his
calcium.  Renal ultrasound was negative for obstruction but
showed bilateral nephromegaly (concern for lymphomatous
involvement of the kidneys).  The patient was extremely edematous
after IV fluid hydration.  He was initially on a Lasix drip to
keep his urine output at least 150-200 cc/h.  The Lasix drip was
discontinued on 01/04/05, and the patient was allowed to auto
diurese.  At this point, the patient required PhosLo for low
calcium high phosphorus.  The patient was followed by the Renal
Consult Service while inhouse.  He had a repeat renal ultrasound
01/10/05 which showed diffusely enlarged kidneys as well as
retroperitoneal adenopathy.  His creatinine improved over the
course of his admission and was 3.3 on the day of discharge.  His
calcium and phosphorus were within normal limits.  He will follow
up with Renal as an outpatient.
2.   Heme-Onc:  The patient has diffuse lymphadenopathy and flow
cytometry from November suspicious for T-cell lymphoma.  The
patient had an excisional lymph node biopsy.  Past pathology was
consistent with T-cell lymphoma.  His overall picture is
consistent with HTLV-1 associated lymphoma.  Serologies were
pending at the time of the patient's discharge.  The patient
started a modified CHOP regimen (cyclophosphamide, doxorubicin,
etoposide, and prednisone) on 12/31.  The patient's tumor lysis
labs were followed closely.  His uric acid increased post
chemotherapy but remained stable and was last measured at 6.0.
The patient was maintained on allopurinol.  The patient was
started on GCSF post chemotherapy but this was discontinued on
01/06/05.  The patient had continued leukocytosis post
chemotherapy while on GCSF but his white blood cell count
decreased and was 9 on the day of discharge.
3.   Infectious Disease:  The patient has a history of a positive
PPD.  He will follow up this up as an outpatient regarding the
need for isoniazid in the setting of immunosuppression.  The
patient was noted to have discharge around his Foley catheter.
Cultures of the discharge showed Gram-negative rods.  Urine
culture grew E. coli (ESBL).  The patient was started on
imipenem.  He will continue imipenem at home for 7 more days to
complete a 10-day course.  The patient had negative CMV toxo and
monospot in 10/04.
4.   GI:  The patient had rising LFTs and bilirubin during this
admission.  The etiology of these abnormalities is unclear,
possibly secondary to GCSF.  The patient had no abl abdominal
pain and no fever.  His LFTs trended down toward normal limits by
the time of discharge.
5.   Heme:  The patient was put on a heme-onc scale and was
transfused to maintain a hematocrit greater than 26.  The patient

BRIGHAM AND WOMENS' HOSPITAL
75 FRANCIS ST., BOSTON, MA 02115                        PAGE  4 of  5
ADM DATE:  12/29/04                              086 31 64 0
DIS DATE:  01/10/05                              (DFCI) 321989
ATTENDING DR:  FREEDMAN,ARNOLD S.,M.D.          PAMPHILE,JOSEPH
                                                DOB:  01/26/58  M
                  *FINAL DISCHARGE SUMMARY REPORT*
-----------------------------------------------------------------
has also had a decrease in his platelet count.  Platelets were in
the 400s on admission and were 75 on the day of discharge.
Counts will be followed closely by the patient's outpatient
oncologist.
6.  Prophylaxis:  Subq heparin.
7.  Code:  Full.

DISPOSITION:
The patient was discharged to home in stable condition.  He will
have a visiting nurse to assist with line care, med compliance,
and antibiotics.  He has been instructed to record daily weights
and record them for the doctor.  He has followup with Dr.
Wadleigh his outpatient oncologist.  In addition, he will see Dr.
Saio in Renal Clinic on 01/24/05.  At this time, his chemistries
and tumor lysis labs will be rechecked and followed by his
outpatient oncologist.

DISCHARGE MEDICATIONS:
Tylenol 325 mg p.o. q.8h. p.r.n. headache, allopurinol 200 mg
p.o. q.d., Peridex mouthwash 10 mL b.i.d., Thorazine 10 mg p.o.
b.i.d. p.r.n. hiccups, clotrimazole one troche p.o. q.i.d.,
Colace 100 mg p.o. b.i.d., imipenem 250 mg IV b.i.d., Ativan 1 mg
p.o. q.6h. p.r.n. nausea vomiting, Lopressor 50 mg p.o. b.i.d.,
nystatin suspension 10 mL swish and swallow q.i.d., senna two
tabs p.o. b.i.d., Compazine 5-10 mg p.o. q.6h. p.r.n. nausea,
Ambien 5 mg p.o. q.h.s. p.r.n. insomnia, Anusol ointment TP q.d.,
Nexium 20 mg p.o. b.i.d.


eScription document:1-7227220 EMSSten Tel


CC: Arnold Freedman
Dana-Farber Cancer Institute
44 Binney Street
Boston, MA 02115
CC: Martha Wadleigh MD


Dictated By: GOLDMANN, RACHEL
Attending:  FREEDMAN, ARNOLD STEPHEN

Dictation ID 7227220
D: 01/12/05
T: 01/13/05

Electronically signed by FREEDMAN,ARNOLD S.,M.D. on 01/14/05

BRIGHAM AND WOMEN'S HOSPITAL                    086-31-64-0
A Teaching Affiliate of Harvard Medical School
75 Francis Street, Boston, Massachusetts 02115          PAMPHILE,JOSEPH
(617) 732-5500
                                                M48  Room: 4B-401
# DISCHARGE SUMMARY                             Service: ONC
                                                Adm: 01/14/05 2:01pm
     ***FINAL***

---

DISCHARGE PATIENT ON: 01/19/05 10:00 AM          DISPOSITION: Home w/ services
DISCHARGE CONTINGENT UPON: Not Applicable
CODE STATUS:  Full code
WILL D/C ORDER BE USED AS THE D/C SUMMARY: YES
Attending: MUNSHI,NIKHIL C.,M.D.
Provider to phone with questions:

---

DISCHARGE MEDICATIONS:                    DISCHARGE INSTRUCTIONS:
SEE ATTACHED PAGE FOR DISCHARGE MEDS      | |  DIET: No Restrictions
                                          | |  ACTIVITY: Resume regular exercise
                                          | |
                                          | |  FOLLOW UP APPOINTMENT(S): Rachel Rosovsky, MD 1/21 9:00
                                          | |  scheduled,
                                          | |
                                          | |
                                          | |
                                          | |
                                          | |
                                          | |

---

ALLERGIES: NKA

ADMIT DIAGNOSIS:
 fever and neutropenia pneumonia, likely MRSA

PRINCIPAL DISCHARGE DIAGNOSIS (Responsible After Study for Causing Admission)
 pneumonia

OTHER DIAGNOSES (Other Conditions,Infections,Complications, affecting Treatment/Stay):
 HTLV-1 T cell lymphoma Pneumonia

---

OPERATIONS AND PROCEDURES:
 None.

OTHER TREATMENTS/PROCEDURES (NOT IN O.R.)
 CT chest.

BRIEF RESUME OF HOSPITAL COURSE:
 46M w/ recently dx'd HTLV-related T cell

HAM AND WOMEN'S HOSPITAL                                    086-31-64-0
ing Affiliate of Harvard Medical School                  PAMPHILE,JOSEPH
cis Street, Boston, Massachusetts 02115
732-5500                                                 M48  Room: 4B-401
                                                         Service: ONC
DISCHARGE SUMMARY page 2                                  Adm: 01/14/05 2:01pm

      ***FINAL***

---

**BRIEF RESUME OF HOSPITAL COURSE: (continuation)**
lymphoma who was d/c'd on 1/10 after 2wk admission for major
hypercalcemia (to 17) and after getting modified CHOP regimen. He also
had an ESBL E. coli UTI at that time and was sent
home on IV imipenem. He was also PPD+ and
management of this was deferred. He is
re-admitted 1/14 w/ F&N and scant, non-massive
hemoptysis with concern for both the standard bacteria,
but also for possible fungus or even active TB
given the
hemoptysis. PE: low-grade fever, slightly tachy, LE
edema persistent from past admit thought 2/2
to resolving volume overload from all the IVF
he got last wk to rx his high
Ca LABS: Ca down to 8.8, Cr 2.2,
neutropenic Plan:
1. RENAL/FEN: Cr 2.2 on admission, still volume overloaded based on
LE edema.  Continued with large volume urination each day, with impr
ovement in his LE edema.  HIs Cr continued to improve and was 1.6 prior
to discharge.  Patient also with suspected lymphomatous
involvement of his kidneys seen on u/s from prior admit.
Antibiotic doses altered to accommodate improving renal function.  The
patient was continued on allopurinol to ppx vs tumor lysis syndrome.
2. HEME/ONC: decreasing LAD post-chemo.  Neutropenic on admission,
but ANC >500 by time of discharge.  Plt also increased since
previous discharge. The patient will follow with his
outpatient oncologist re further chemo and ? retrovirals  v. HTLV.
3. ID: F&N, started initially on  imipenem (started last admission
for ESBL uti), vanco given PICC, and levoflox (for atypicals).  ID
consulted.  Chest CT showed RLL infiltrate, most c/w bacterial pna.
Also with some b/l nodular densities concerning for fungus, but pt
improved rapidly with antibiotics only. Galactomannan/beta-glucan
pending at the time of discharge.  Also considered TB given h/o +PPD
and hemoptysis.  Induced sputum AFB stain neg x 3, so patient taken
off of initial airborne precautions.  He will f/u cultures as an
outpatient to determine anti-TB regimen. ID consult initially
recommended a number of cx and serologies.  Blood and urine cx neg to d
ate. crypto and toxo serologies neg.  Legionella neg. Other labs
pending at time of discharge including strongy Ab, urine histo. HIV
also negative. The patient completed his course of imipenem, with
improved f/u urinalysis.  He will continue IV
 vanco and levo for another 10 days to complete a 14d course.  The
patient was afebrile
by HD 2, cough/hemoptysis resolved.  4. Hemoptysis: initial concern
for fungal or active TB, perhaps from lymphoma and briefly considered

HAM AND WOMEN'S HOSPITAL                          086-31-64-0
ing Affiliate of Harvard Medical School       PAMPHILE,JOSEPH
ncis Street, Boston, Massachusetts 02115
732-5500                                      M48  Room: 4B-401
                                              Service: ONC
DISCHARGE SUMMARY page 3                          Adm: 01/14/05 2:01pm

   ***FINAL***

_____

BRIEF RESUME OF HOSPITAL COURSE: (continuation)
   PE, but think unlikely as rapid improvement with antibiotics. O2 sats
stable. Hemoptysis was never massive and was always white phlegm with
blood streaks and not frank blood. Hct was stable.  A pulmonary
consult was
called, but felt no need for bronch given resolving hemoptysis.
Since 1/17 hemoptysis improving, now resolved. 5. Heme: transfuse per
scale   6. PPX. Heparin held given hemoptysis, then started once
hemoptysis resolved. Also on nexium. 7. Code - full

ADDITIONAL COMMENTS:
   You will have a visiting nurse to deliver the vancomycin and to help
with administration of the vancomycin. They will also provide flushes
and dressing changes for your PICC line.  Please take the vancomycin
through your line twice a day for 10 more days. Take levofloxacin by
mouth once a day for 10 more days.  Please make sure you complete the
entire course of antibiotics. Please take atenolol for your blood
pressure (this in INSTEAD of lopressor, please do not take both).

TO DO/PLAN:
   Please take the levaquin by mouth once a day and the vancomycin by IV
twice a day (we suggest 7am and 7pm for convenience) for 10 more days.
Please follow-up with Drs. Rosovsky and Wadleigh on Friday, 1/21.
Please call Dr. Wadleigh if you have any fevers, coughing up
blood, increased swelling, shortness of breath, or any other
symptoms that concern you.

DISCHARGE CONDITION: Stable

DISCHARGE MEDICATIONS:


TYLENOL  (ACETAMINOPHEN ) 650 MG PO  Q6H
Starting Today  (01/19) PRN Headache
ALLOPURINOL 200 MG PO  DAILY
ARTIFICIAL TEARS 2 DROP OU  TID
CEPACOL 1 LOZENGE PO  Q4H   PRN Other:sore throat
PERIDEX MOUTHWASH  (CHLORHEXIDINE MOUTHWASH 0.12% )
10 MILLILITERS BID
THORAZINE  (CHLORPROMAZINE HCL) 10 MG PO  BID

Discharge meds continued on next page

...HAM AND WOMEN'S HOSPITAL
...ng Affiliate of Harvard Medical School
...cis Street, Boston, Massachusetts 02115
...732-5500

PAMPHILE,JOSEPH                086-31-64-0

M48  Room: 4B-401
Service: ONC
                Adm: 01/14/05 2:01pm

...ISCHARGE SUMMARY page 4

    ***FINAL***

---

DISCHARGE MEDICATIONS: (continuation)

PRN Other:hiccups
CLOTRIMAZOLE TROCHE  1 TROCHE PO  QID
COLACE  (DOCUSATE SODIUM) 100 MG PO  BID
ATIVAN  (LORAZEPAM) 1 MG PO  TID    PRN Insomnia,Anxiety
NYSTATIN SUSPENSION (MOUTHWASH)
10 MILLILITERS SWISH & SWALLOW  QID
SENNOSIDES 2 TAB PO  BID
VANCOMYCIN HCL 1 GM IV  Q12H  X 20 doses
Starting Today  (01/19) Instructions: 10 more days.
COMPAZINE  (PROCHLORPERAZINE) 10 MG PO  Q6H    PRN Nausea
AMBIEN  (ZOLPIDEM TARTRATE) 10 MG PO  BEDTIME    PRN Insomnia
Food/Drug Interaction Instruction
Give on an empty stomach (give 1hr before or 2hr after
food) Reason(s) physician prefers to use Non-Formulary Drug.
Pt requires. Number of Doses Required (approximate):  4
LEVOFLOXACIN 500 MG PO  DAILY  X 10 doses
Starting Today  (01/19) Instructions: 10 more days.
NEXIUM  (ESOMEPRAZOLE) 20 MG PO  DAILY
ATENOLOL 75 MG PO  DAILY

---

Entered by: GOLDMANN,RACHEL E.,M.D.
GOLDMANN,RACHEL E.,M.D.  (RG68)

                                                01/19/05

Physician's signature                           Date

Printed: 12:20 PM Jul 27, 2006

BRIGHAM AND WOMEN'S HOSPITAL
A Teaching Affiliate of Harvard Medical School
75 Francis Street, Boston, Massachusetts 02115
(617) 732-5500

086-31-64-0

PAMPHILE,JOSEPH

M48  Room: 5B-371
Service: ONC
Adm: 02/02/05 8:42pm

# DISCHARGE SUMMARY

### ***FINAL***

---

**DISPOSITION:** Home

DISCHARGE PATIENT ON: 02/06/05 02:00 PM
DISCHARGE CONTINGENT UPON: Not Applicable
CODE STATUS:  Full code
WILL D/C ORDER BE USED AS THE D/C SUMMARY: YES
Attending: SIRULNIK,LEONARDO A.,M.D.,PH.D.
Provider to phone with questions:

---

**DISCHARGE MEDICATIONS:**
SEE ATTACHED PAGE FOR DISCHARGE MEDS

**DISCHARGE INSTRUCTIONS:**
DIET: No Restrictions
ACTIVITY: Walking as tolerated

FOLLOW UP APPOINTMENT(S): Dr. Wadleigh 1 week,

ALLERGIES: NKA

**ADMIT DIAGNOSIS:**
Lymphoma

**PRINCIPAL DISCHARGE DIAGNOSIS (Responsible After Study for Causing Admission)**
HTLV + ATLL

**OTHER DIAGNOSES (Other Conditions,Infections,Complications, affecting Treatment/Stay):**
Neurocysticercosis, nasopalatine cyst, portal vein hypertension

---

**OPERATIONS AND PROCEDURES:**
none

**OTHER TREATMENTS/PROCEDURES (NOT IN O.R.)**
CT CHEST
Bronchoscopy

**BRIEF RESUME OF HOSPITAL COURSE:**
ID: 46 M h/o recent dx of HTLV+ acute T cell

GHAM AND WOMEN'S HOSPITAL
ching Affiliate of Harvard Medical School
rancis Street, Boston, Massachusetts 02115
17) 732-5500

086-31-64-0

PAMPHILE,JOSEPH

M48  Room: 5B-371
Service: ONC
        Adm: 02/02/05 8:42pm

# DISCHARGE SUMMARY page 2

***FINAL***

**BRIEF RESUME OF HOSPITAL COURSE: (continuation)**
lymphoma (ATLL) s/p CHOP Rx p/w likely febrile neutropenia.
HPI: Haitian native who originally presented in 10/04 w/ bulky
inguinal LAN, was lost to f/u, and ultimately was dx'd 12/04 when he
re-presented w/ worsening LAN, ARF, and hypercalcemia. In
additi on, w/u notable for HTLV + as above. He
underwent chemotherapy w/ cytoxan, doxorubicin, etopo
(CDE) and prednisone starting 12/31/04. Of note, he had
a GNR ESBL UTI Rx'd w/ imipenem that hospitalizati on. D/c'd 1/11/05
but returned 1/14/05 for F&N and hemoptysis (extensive w/u + for RLL
infiltrate, likely bacterial), discharged on Vanco/Levo.
Start ed CHOP 1/21/05. Today, pt called onc fellow
w/ c/o fevers to 101.4 @ home starting yesterday
w/ assoc sx's of sore throat, dysuria, and
heartburn. PMH: ?neurocysticercosis s/p Rx; prior
HAV/HBV/CMV infections; portal vein HTN; nasopalatine cyst
s/p enucleation
8/04 NKDA
PE: T96 VSS; anicteric, MMM, no sinus tenderness, diffuse cervical,
SC, axillary, inguinal LAN; no oral ulcerations, chest clear, 2/6 SM
LLSB, no HSM, mild scrotal swelling, mild LE edema b/l,
no rectal
ulcerations LABS:
pending CXR/EKG:
pending A/P: suspicion for recurrent F&N in this 46 y/o
M w/
HTLV+ ATLL day 13 of cycle 2 of CHOP. assoc sx's of
sore throat, dysuria, heartburn. we await his
blood counts at this time. if neutropenic, likely
start imipenem given his h/o ESBL UTI in past. no
lines, no vanco at this time. swab throat.
pan-culture, including urine. cxr. consider TTE although
murmur likely flow murmur.
**************HOSPITAL COURSE********************
The patient's ANC nadir was 900; he was never neutropenic during
hospitalization. However, the patient continued to spike as high as 102.
CXR was notable for multifocal infiltrates, predominantly peripherally
located. A follow-up CT CHEST confirmed multifocal infiltrates.
A bronchoscopy was performed which was relatively showed 1320 WBC (49%
lymphs, 43% monos, 5% atypicals. There were rare polys and no organisms on
gram stain.) Cultures at this time remain NGTD, but found to have PCP.
Started on 21 day course of bactrim and given large A-a gradient, on
Predinone taper as well. Throat swabs for CMV PCR and nasal swabs for
RSV/adeno/flu/paraflu/mycoplasma and virus pending as well as HHV-6 and
fungal isolators from serum (pending at this time). The patient was

GHAM AND WOMEN'S HOSPITAL
aching Affiliate of Harvard Medical School
Francis Street, Boston, Massachusetts 02115
(617) 732-5500

086-31-64-0

PAMPHILE,JOSEPH

M48  Room: 5B-371
Service: ONC
Adm: 02/02/05 8:42pm

# DISCHARGE SUMMARY page 3
### ***FINAL***

---

**BRIEF RESUME OF HOSPITAL COURSE: (continuation)**
hydrated w/ IVF and treated w/anti-pyretics. He will be discharged to home
w/o antipyretics and Bactrim/Prednisone and follow-up with his oncologist
within the week.

**ADDITIONAL COMMENTS:**
Please finish full course of Bactrim and Prednisone

**TO DO/PLAN:**
Follow up w/ Dr. Wadleigh within 1 week
Follow up with microbiology results

**DISCHARGE CONDITION:** Stable

**DISCHARGE MEDICATIONS:**

```
TYLENOL  (ACETAMINOPHEN ) 650 MG PO  Q4H
PRN Headache,Other:fever
ALLOPURINOL 150 MG PO  DAILY
ATENOLOL 75 MG PO  DAILY    HOLD IF: sbp < 100, hr < 55
COLACE  (DOCUSATE SODIUM) 100 MG PO  BID
ATIVAN  (LORAZEPAM) 1 MG PO  Q6H
PRN Nausea,Insomnia,Anxiety
HOLD IF: resp rate < 10, oversedation
ZOFRAN (CHEMO N/V)  (ONDANSETRON HCL (CHEMO N/V))
8 MG PO  Q8H  X 20 Days
Instructions: please give PRN for nausea
COMPAZINE  (PROCHLORPERAZINE) 10 MG PO  Q6H   PRN Nausea
AMBIEN  (ZOLPIDEM TARTRATE) 10 MG PO  BEDTIME    PRN Insomnia
Food/Drug Interaction Instruction
Give on an empty stomach (give 1hr before or 2hr after
food) Reason(s) physician prefers to use Non-Formulary Drug.
home med Number of Doses Required (approximate):  3
COMBIVIR  (LAMIVUDINE/ZIDOVUDINE) 1 TAB PO  BID
NEXIUM  (ESOMEPRAZOLE) 20 MG PO  DAILY
BACTRIM DS  (TRIMETHOPRIM/SULFAMETHOXAZOLE DOU...)
2 TAB PO  TID   Instructions: last dose on Feb 25
```

Discharge meds continued on next page

GHAM AND WOMEN'S HOSPITAL
ching Affiliate of Harvard Medical School
Francis Street, Boston, Massachusetts 02115
17) 732-5500

# DISCHARGE SUMMARY page 4

***FINAL***

PAMPHILE,JOSEPH          086-31-64-0

M48   Room: 5B-371
Service: ONC
        Adm: 02/02/05 8:42pm

---

DISCHARGE MEDICATIONS: (continuation)

PREDNISONE Taper PO          Give 40 mg q 12 h X 8 dose(s) , then
Give 40 mg q 24 h X 5 dose(s) , then
Give 20 mg q 24 h X 11 dose(s) , then
THORAZINE   (CHLORPROMAZINE HCL) 25 MG PO  TID
PRN Other:hicupps

---

Entered by: LIVSHIN,MARIA,M.D.
LIVSHIN,MARIA,M.D.   (ML120)

Physician's signature

02/06/05

Date

Printed: 12:21 PM  Jul 27, 2006

```
BRIGHAM AND WOMENS' HOSPITAL                      PAGE  1 of  6
75 FRANCIS ST., BOSTON, MA 02115          086 31 64 0
ADM DATE:  03/07/05                       (DFCI) 321989
DIS DATE:  03/15/05                       PAMPHILE,JOSEPH
ATTENDING DR:  DEANGELO,DANIEL J.,M.D.    DOB:  01/26/58  M
```

### *FINAL DISCHARGE SUMMARY REPORT*
---------------------------------------------------------------

ATTENDING: DEANGELO, DANIEL MD, PHD


SERVICE:  Oncology D.

PRINCIPAL DIAGNOSES:  Human T-cell leukocyte virus subtype I
associated adult T-cell leukemia/lymphoma (HTLV-I associated
ATLL).

OTHER SIGNIFICANT PROBLEMS:
1.  Acute renal failure.
2.  Altered mental status.
3.  Aspiration pneumonia.
4.  Hypertension.
5.  Hypercalcemia.
6.  Tumor-lysis syndrome.
7.  Hypoxia.
8.  Diffuse encephalopathy.

HISTORY OF PRESENT ILLNESS: Mr. Pamphile is a 47-year-old
Haitian gentleman with adult T-cell leukemia/lymphoma syndrome
who was admitted with confusion, lethargy, and fevers.  The
patient has a history of ATLL.  He received infusional CDE with
near resolution of his disease in the past.  He was then treated
with three cycles of CHOP chemotherapy and fortunately was found
to have progressive disease.  Of note, his prior chemotherapy
course was complicated by Pneumocystis carinii pneumonia for
which he remained on Bactrim prior to admission.  Over a few days
prior to admission, Mr. Pamphile's mental status had been
declining.  He had become more confused and lethargic with
bilateral lower extremity weakness.  He also developed tremors
and generalized twitching, was unable to ambulate without
assistance.  He was taken to the Brigham and Women's Hospital
Emergency Room and he was assessed.  A head CT was performed and
lumbar puncture was performed as well.  He was found to be in
acute renal failure and was admitted for a multiple organ
dysfunction in the setting of progressive end-stage neoplastic
disease.

REVIEW OF SYSTEMS:  He was disoriented, confused, and
encephalopathic and was unable to cooperate with history.

PAST MEDICAL HISTORY:  Significant for:
1.  Human T-cell leukemia/lymphoma virus associated ATLL.
2.  Pneumocystis carinii pneumonia.

BRIGHAM AND WOMENS' HOSPITAL
75 FRANCIS ST., BOSTON, MA 02115
ADM DATE: 03/07/05
DIS DATE: 03/15/05
ATTENDING DR: DEANGELO,DANIEL J.,M.D.

086 31 64 0
(DFCI) 321989
PAMPHILE,JOSEPH
DOB: 01/26/58 M

### *FINAL DISCHARGE SUMMARY REPORT*

3. Human papillomavirus antibody positive.

MEDICATIONS ON ADMISSION: Allopurinol, atenolol, Ativan, baclofen, Bactrim, Combivent, and Compazine.

ALLERGIES: No known drug allergies.

FAMILY HISTORY: No oncologic diseases in his family.

SOCIAL HISTORY: He is from Haiti. He has a girlfriend (Shantelle). Shantelle is his healthcare proxy. He was previously married. Has four children by his first wife. He is a former tobacco user. Occasionally, uses alcohol.

PHYSICAL EXAMINATION ON ADMISSION: He was extremely ill-appearing, lethargic, unable to be sufficiently aroused and cooperative with his physical exam. His vital signs were stable. He had diffuse, firm, immobile lymphadenopathy in the neck, groin, and axillae. He had bibasilar crackles on his lung exam. Neurologically, he was encephalopathic and unable to comply with the full neurologic exam. He was witnessed by staff at times to exhibit myoclonic jerking movements.

LABORATORY DATA: Lab values of significance on admission include a white count of 63,000, hematocrit 28.3, platelets 264,000, differential on his white count includes 51% of cells with convoluted nucleus consistent with ATLL. His creatinine was 8.5, calcium 12.9, ionized calcium 1.66.

DISCHARGE DIAGNOSES:
1. End-stage HTLV-I associated ATLL.
2. Improving acute renal failure.
3. Continuing, though improved encephalopathy.
4. Hypertension.
5. History of Pneumocystis carinii pneumonia.
6. Aspiration pneumonia, improved.
7. Insomnia.

HOSPITAL COURSE BY SYSTEMS:
1. Oncologic: The patient presents with end-stage HTLV-I associated ATLL. According to his Primary and Inpatient Oncology Team, the patient was considered to have cancer refractory to treatments. No further chemotherapy options were available to treat his malignancy. This issue was discussed at length by both Dr. Deangelo, his inpatient attending physician as well as Dr. Wadleigh and Dr. Rosovsky, his Outpatient Oncology Team and among

```
BRIGHAM AND WOMENS' HOSPITAL                    PAGE  3 of  6
75 FRANCIS ST., BOSTON, MA 02115         086 31 64 0
ADM DATE:  03/07/05                      (DFCI) 321989
DIS DATE:  03/15/05                      PAMPHILE,JOSEPH
ATTENDING DR:  DEANGELO,DANIEL J.,M.D.   DOB:  01/26/58  M
```

## *FINAL DISCHARGE SUMMARY REPORT*

the oncologist, the consensus was that no further chemotherapy
options would be beneficial to the patient and would in fact more
likely cause suffering and harm to the patient at best.
Therefore, decision was made in conjunction with the patient's
healthcare proxy to discontinue further aggressive chemotherapy
options.  The patient's malignancy was treated with steroids and
although it is difficult to assess whether or not any improvement
in his overall symptomatology was directly related to transient
improvement in his neoplastic process, he did seem to have
improved mental status after his steroids were given, that was
difficult to say if that is the sole agent that was of benefit.
Given, however, the apparent clearing of his mental status after
steroid administration as well as improvement in his renal
function, he will be discharged on maintenance dose of Decadron.
Early in his course, he showed laboratory values consistent with
tumor-lysis syndrome including high uric acid, allopurinol was
given and hemodialysis was undertaken to manage his uremia and
hyperkalemia.  The patient's labs improved with regards to his
tumor-lysis syndrome and at the time of discharge, he was at low
risk for ongoing tumor-lysis syndrome.  Just prior to his
discharge, his uric acid was 7.3 down from 12.5 on March 10th,
his potassium was below normal limits, both these values
suggesting that his tumor lysis had resolved, however, given his
incredibly high white count greater than 120,000, we will
continue him on allopurinol for prophylaxis of further cell
lysis.
2.  Renal:  Acute renal failure.  The patient was in acute renal
failure on presentation with a creatinine above 9 at its peak.
The Renal Service was consulted and suggested an aggressive trial
of diuretics.  When the patient failed to produce significant
urine output with the trial diuretics, decision was made to go to
hemodialysis to correct his electrolyte abnormalities including
his hyperkalemia and hypercalcemia.  Dialysis was undertaken
without complications, however, after dialysis given the
extremely poor oncologic prognosis and the lack of further
chemotherapy options to manage his oncologic disease, decision was
made to withhold further runs of hemodialysis as the Oncology and
Renal Teams considered further hemodialysis inappropriate given a
clear progressive decline from an oncologic perspective.  The
patient did eventually improve in terms of his creatinine despite
further runs of hemodialysis most likely given a response of the
infiltrative process in his kidneys (secondary to his tumor)
improving after steroid administration.  He began to have a more
generous urine output after the steroid administration, which was
aided by furosemide in attempt to continue with this urine
output.  He will be discharged on a maintenance dose of

PAGE  4 of  6

BRIGHAM AND WOMENS' HOSPITAL
75 FRANCIS ST., BOSTON, MA 02115
ADM DATE:  03/07/05
DIS DATE:  03/15/05
ATTENDING DR:  DEANGELO,DANIEL J.,M.D.

086 31 64 0
(DFCI) 321989
PAMPHILE,JOSEPH
DOB:  01/26/58  M

## *FINAL DISCHARGE SUMMARY REPORT*

-------------------------------------------------------------

furosemide long term; however, given the infiltrative process
that was most likely responsible for his renal failure (he was
also negative for hydronephrosis by ultrasound), it is unlikely
that he can avoid future episodes of acute renal failure (he has
presented with a similar although less severe process of acute
renal failure in the past).
3.  Neurologic:  The patient presented with altered mental
status.  A CT was performed and did not show an acute bleed.  An
EEG was that showed diffuse encephalopathy, most likely
underlying cause of his encephalopathic changes was eventually
considered to be CNS involvement of his tumor.  A lumbar puncture
performed in the emergency department showed evidence of cancer
cells in his cerebrospinal fluid suggesting that his central
nervous system was becoming plagued by his neoplasm.  His
neurologic status was also likely compromised by his uremia.  He
cleared somewhat after getting Decadron and run of hemodialysis
and remained markedly clear though not fully compos mentis at the
time of discharge.  Most likely it was considered a temporary
improvement in the setting of his steroid use and CNS disease.
At first, the Neurology Service was consulted early in his course
given his myoclonic jerks on presentation and apparent
encephalopathy and upon reviewing the EEG, we initially
recommended loading him with Dilantin, but when he cleared after
steroids and hemodialysis, they found it best to remove Dilantin
from his medications and at discharge, the only neurologic
medicine to continue is trazodone as needed for insomnia given
that the patient had several evenings where he was unable to
sleep.
4.  Infectious disease:  The patient was unable to protect his
secretions for first day or two of his admission and appeared to
aspirate.  On exam, his lungs have become coarse and he was
treated empirically with levofloxacin, Flagyl, and eventually
vancomycin for presumed aspiration pneumonia or possibly
nosocomial pneumonia given his recent hospital stays when his
mental status improved and he was able to protect his secretions
and he had remained afebrile for more than 48 hours without
significant evidence of clinical pneumonia or bacteremia.  His
antibiotics were scaled back.  He will be discharged only on
Pneumocystis carinii pneumonia prophylaxis with atovaquone.
5.  Cardiovascular:  The patient's blood pressure was high at
times, and therefore, he was started on beta blockade and
titrated up conservatively given the risk of hypotensive
episodes.  He should continue with his beta-blocker after
discharge.
6.  GI/fluid, electrolytes, nutrition:  The patient will be
discharged on a bowel regimen.

```
                                              PAGE  5 of  6
BRIGHAM AND WOMENS' HOSPITAL
75 FRANCIS ST., BOSTON, MA 02115        086 31 64 0
ADM DATE: 03/07/05                      (DFCI) 321989
DIS DATE: 03/15/05                      PAMPHILE,JOSEPH
ATTENDING DR:  DEANGELO,DANIEL J.,M.D.  DOB: 01/26/58  M
```

## *FINAL DISCHARGE SUMMARY REPORT*

-----------------------------------------------------------------

7.  Nutrition:  The patient will continue on thiamine and he should have a diet as tolerated.

8.  Psychiatry:  The patient was extremely agitated, early in his course, demonstrating physically defensive behavior consistent with paranoid ideation at times.  He was given Haldol with good relief of his apparent delirium and agitation.  At the time of discharge, he was much clear and less agitated, but we will give him a prescription for Haldol as needed given the potential for further agitation as his neoplastic process is likely to recur.

The patient's condition at discharge is poor with general poor prognosis given his neoplasm in the future.  Code status at the time of discharge is do not resuscitate and do not intubate per the patient's healthcare proxy, his girlfriend Shantelle.  His future care plan, the patient will be discharged with medications as stated:  Allopurinol 200 mg p.o. q.d., dexamethasone 4 mg p.o. b.i.d., Colace 100 mg p.o. b.i.d., Lasix 40 mg p.o. b.i.d., Haldol 1 mg to 2 mg p.o. q.6h. as needed for agitation, lactulose 30 mL p.o. q.i.d., Lopressor 37.5 mg p.o. t.i.d., senna two tablets p.o. b.i.d., thiamine 100 mg p.o. q.d., trazodone 50 mg p.o. h.s. as needed for insomnia, atovaquone suspension 750 mg p.o. b.i.d.

FUTURE CARE PLAN:  The patient will go home for home hospice in the care of Shantelle, his healthcare proxy and girlfriend.  Mr. Pamphile has a caring set of family members and close friends who visited him during his time in the hospital and his healthcare proxy decided that it would be best to have him spend the remainder of his life outside the hospital at home with symptomatic control of his illness given his full prognosis. This decision to try and aim for comfort and quality of life over aggressive intervention was not made easily and there was much discussion among Shantelle and the members of Mr. Pamphile's family along with the Oncology Teams throughout his stay with an effort to reach the consensus that was respectful to the wishes of the patient and his proxy as well as his family and yet to remain within the bounds of appropriate medical care as guided by the Oncology And Renal Teams in-house.  For any future medical-related questions after discharge, Mr. Pamphile and his caregivers are encouraged to keep in close contact with his primary oncologist Dr. Wadleigh at the Dana-Farber Cancer Institute and Dr. Rachel Rosovsky of Dana-Farber Cancer Institute.

PROCEDURES DURING THIS HOSPITAL ADMISSION:
1.  Lumbar puncture.

BRIGHAM AND WOMENS' HOSPITAL                    PAGE  6 of 6
75 FRANCIS ST., BOSTON, MA 02115               086 31 64 0
ADM DATE:  03/07/05                             (DFCI) 321989
DIS DATE:  03/15/05                            PAMPHILE,JOSEPH
ATTENDING DR: DEANGELO,DANIEL J.,M.D.          DOB:  01/26/58  M

                    *FINAL DISCHARGE SUMMARY REPORT*
-------------------------------------------------------------------
2.  Hemodialysis.
3.  EEG.
4.  CT scan of the head.

All procedures above were completed without complications.  The
patient tolerated the procedures well.

FUTURE TESTS AND TREATMENTS:  Treatments as above in the listed
medications.  No future tests are indicated at this point.
Again, the patient and his family are encouraged to keep a close
contact with his Primary Oncology Team at the Dana-Farber to
assist them with any questions or concerns or needs that they may
have to ensure as good quality of life for Mr. Pamphile as is
possible.


eScription document:4-7498687 IS


CC: Daniel Joseph Deangelo M.D.
Dana-Farber Cancer Institute
44 Binney Street
Boston, MA 02115
CC: Martha Wadleigh MD
CC: Rachel Rosovsky M.D.
Mental Health Center
43 Garrison Road
Brookline, MA 02445


Dictated By: KRAKOWER, DOUGLAS
Attending:  DEANGELO, DANIEL

Dictation ID 7498687
D: 03/14/05
T: 03/15/05

## COLONIAL NURSING CENTER

### Admission Form

Resident Name: PAMPHILE                    JOSEPH

Resident #: 7967          Level of Care: 1          Payment Source: Insurance

Admission date: 03/21/2005    Time: 624P    Unit: ___    Room #: ___    Bed #: ___    Room Rate: ___.00

Address: 1751 WASHINGTON ST., #6, BRAINTREE, MA 02184

Phone #: 781-848-5012        DOB: 01/26/1958    Age: 47    Place of birth: ___        Gender: M

Religion: CATHOLIC        Lifetime occupation: ___        Social Secur. #: 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

Race: BLACK    Marital Status: *Not Married* ~~Never Married~~        Primary Language: ENGLISH        Maiden Name: ___

Citizenship: ___

---

Notify in Emergency: Name: THANOR, CHANTELLE        Phone: H 781-848-5012    W 617-861-7682

Address: ___                    Rel: FRIEND

Power of Att'y. Yes [ ]  No [ ]        Doc. on File: Yes [ ]  No [ ]

Name: ___        Phone: H ___    W ___

Address: ___

Billing Info To: Name: PAMPHILE, JOSEPH        Phone: H 781-848-5012    W ___

Address: 1751 WASHINGTON ST., #6, BRAINTREE, MA 02184

Other Family/Friends:

Name: ___    Phone: H ___    W ___    Rel: ___

Address: ___

Name: ___    Phone: H ___    W ___    Rel: ___

Address: ___

---

Advance Directives: Yes [ ]  No [ ]        Doc. on File: Yes [ ]  No [ ]

Health Care Agent: Yes [ ]  No [ ]        Doc. on File: Yes [ ]  No [ ]

Name: ___        Phone: H ___    W ___

Referring Physician: ___        Phone: ___    Fax: ___

Attending Physician: BREGOLI, ARTHUR        Phone: 781-849-7330    Fax: 781-356-7599

Alternate Physician: ANSWERING SERVICE        Phone: ___    Fax: ___

Consulting Physician: PRIOR AUTHORIZATION NEEDED        Phone: ___    Fax: ___

Primary Care Physician: ___        Phone: ___    Fax: ___

Podiatrist: PRIOR AUTHORIZATION NEEDED        Phone: ___    Fax: ___

Dentist: PRIOR AUTHORIZATION NEEDED        Phone: ___    Fax: ___

Ophthalmologist: PRIOR AUTHORIZATION NEEDED        Phone: ___    Fax: ___

Pharmacy: OMNICARE        Phone: ___    Fax: 508-835-2368

| Admitting Dx | Code | Admitting Dx | Code |
|---|---|---|---|
| T-CELL LYMPHOMA | 202.10 | ACUTE RENAL FAILURE NOS | 584.9 |
| SEC MALIG NEO NERVE NEC | 198.4 | | |
| ENCEPHALOPATHY NOS | 348.39 | | |

Hospitals and Extended Care Facilities:

Brigham and Women's Hosp. 75 Francis Street, Boston, MA        adm: 03/07/05 disch: 03/15/05

adm: ___    disch: ___

adm: ___    disch: ___

adm: ___    disch: ___

---

Medicare #: ----------        A [ ]  B [ ]    Medicaid #: N

Insurance Company: BLUE CROSS        Policy #: XXH983932921    Group#/Code ___

Insurance Company: ___        Policy #: ___    Group#/Code ___

Insurance Company: ___        Policy #: ___    Group#/Code ___

---

Hospital Pref: Name: Brigham and Women's Hosp.        Phone: 617-732-5500

Funeral Home Pref.: Name: CARTWRIGHT FUNERAL        Phone: 767-4116

Pre-paid Amount: 7971        Arrangements made? Yes [ ]  No [V] ___

---

Discharge date: 03/23/2005    Discharge time: 205P    AM [ ]  PM [ ]    Discharged by: ___

Disch. to: FUNERAL HOME        Phone: ___

Discharge Reason: ___        LOS: 2 Days    Expired [ ]

Discharge Dx/Problem: T-CELL LYMPHOMA

**BRIGHAM AND WOMEN'S HOSPITAL**
A Teaching Affiliate of Harvard Medical School
75 Francis Street, Boston, Massachusetts 02115
main #:(617)732-5500

PATIENT: PAMPHILE,JOSEPH
DESTINATION:
LOC.:        DPC: #

PATIENT: PAMPHILE,JOSEPH                **PATIENT CARE REFERRAL FORM**

                                        Med. Record# 086-31-64-0C

                **NURSING INSTRUCTIONS** (Page 2)

Patient Care Plan:

Mr Pamphile is a 47 year old patient who was admitted on March 7, 2005 for mental status changes and acute renal failure. He has nonhodgkins lymphoma and a lumbar puncture was performed on this admission and showed metastisis to his spine. An EEG was done and showed diffuse encephalopathy.

ROS
Neuro:  Pt. is currently A+Ox3, but has been A+Ox0 - only responsive to pain.
Resp: Pt lung sounds are rhoncherous thourghout and dim at the bases. The pt does not complain of any SOB or DOE. His breathing is even and unlabored. His O2 sat is 96-100% on room air.
Cardiac: He has not complained of any chest pain during this admission. He is in normal sinus rhythm with his heart rate ranging 50-80. His BP has been elevated 140-190/70-90. His temp is 97-98 with a max of 100.7.
GI: Abd soft, nontender, nondistended. + BS x4. No c/o N/V/D. Pt. had not had a BM in 6 days and was given lactulose QID and he had 6 large BMs on 3/13/05. He has a diet of clear liquids.
GU: He has a foley catheter putting out quantity sufficeint clear yellow urine.
Mobility:  Pt. was seen by PT and ambulates with a steady gait with a walker.
Code Status: Pt. is a DNR/DNI. Health care proxy is Pt's girlfriend Chantal.
Psychosocial:  Pt. has a wife who he has a restraining order against because of physical abuse and threatening to kill him. Pt's girlfriend Chantal also has a restraining order against his wife. He has a very supportive group of family and friends who visit everyday. Plan: Ultimately Pt. and his girlfriend have expressed interest in going back to Haiti for the patient to die.

Nurse's signature:  WICKMAN,ROSEMARY  Date:03/15/05 ph# (617)732-7910

                        Page 4
            Printed by: WICKMAN,ROSEMARY 03/15/05  05:48 PM

MAR-21-2005  17:29          781 843 7350          95%          P.02

**BRIGHAM AND WOMEN'S HOSPITAL**
A Teaching Affiliate of Harvard Medical School
75 Francis Street, Boston, Massachusetts 02115
main #:(617)732-5500

PATIENT: PAMPHILE,JOSEPH
DESTINATION:
LOC.:              DFCI #

PATIENT CARE REFERRAL FORM

Med. Record# 086-31-64-0

PATIENT: PAMPHILE,JOSEPH

### Care Coordination: (Page 3)

Mr Pamphile is  a pleasant 47 yo man who wasa dmitted to BWH w
lymphoma and diagnosed to have spine mets.Pt lives in Braintree with
his GF chantell who is his HCP and her 2 kids ages 16 and 9 yo .Pt has
a restraining order for his ex wife as there is evidence of abuse.Pt
will be outpt hospice at present but may be admitted to inpt SNF if
his care becomes overwhelming for Chantelle.He eventually plans to
return to Haiti if possible. will also need Socail services for outpt
family support.His insurance is BC-Partners plus.Thank you.

Care Coordinator's signature:  KIRIAKIDIS,ANNA  Date:03/15/05

=====================================================================

Rehabilitation Services
Physical Therapy Evaluation

Phone:(617)732-5301

Evaluation type: Referral Discharge

**Diagnosis**
    Lymphoma, Hypercalcemia

**Orders/Precautions**
    PT consult: Please assess re: Ability to travel home today.

    HPI: 47 y/o male with lymphoma with dizziness and rhythmic shaking of
    head, arms and legs, c/o room spinning. Presented to ED on 3/7/05 with
    mental status changes.

    PMH: PCP, HBV, lymphoma, tumor lysis syndrome, renal insufficiency,
    portal HTN.

    PSH: Lymphnode biopsy.

**Social/Environmental**
    Pt lives with his girlfriend in Braintree, MA with 5 steps with a
    railing to enter his one level home.

**Prior Functional Level**
    Independent without device.

**Current Functional Level**
**Bed Mobility**
    Roll side to side:  Not applicable
    Supine to sit:  Stand by
    Comments:HOB elevated.
    *********************
    3/15/05 Pt up in chair prior to treatment.
    Sit to supine:  Not applicable
    Comments:Pt up in chair after treatment.

**Transfers**
    Sit to stand:  Independent                            Continued
**Transfers**
    Stand to sit:  Independent                            Continued
    Comments:3/15/05 With cane.
**Transfers**
    Bed to chair:  Not applicable                         Continued
**Gait**
**Gait**
    Level:  Stand by
    Comments:3/15/05 Ambulated using cane x 100 feet.  Continued
**Gait**
    Stairs:  Stand by
    Comments:Not yet ready for stairs.

Page 5

**BRIGHAM AND WOMEN'S HOSPITAL**
A Teaching Affiliate of Harvard Medical School
75 Francis Street, Boston, Massachusetts 02115
**main #:(617)732-5500**

PATIENT: PAMPHILE,JOSEPH
DESTINATION:
LOC.:              DFCI #

### PATIENT CARE REFERRAL FORM

PATIENT: PAMPHILE,JOSEPH                                Med. Record# 086-31-64-0

Rehabilitation Services
Physical Therapy Evaluation
Phone:(617)732-5301                              Continued

**Discharge Plan/Recommendations**
    Pt is a 47 y/o male with Lymphoma admitted to BWH on 3/7/05 with
    mental status changes. Pt will benefit from PT while in-house to
    attain above stated goals. Will re-assess as needed.
    ************************************************************
    3/15/05 Pt to be discharged later today to home. Pt near independent
    with all mobility and will have home hospice services at home.

**Modality/Equipment**
    at BWH, Loaner walker.
    *****************************
    3/15/05 Issued cane to pt.

**Evaluation time**
    Angela M. Powers PT,  3/13/05/updated 3/15/05 Angela M. Powers, PT 33699, 15 minutes.


    Physical Therapist's signature:  POWERS,ANGELA M.  Date:03/15/05

# PHYSICIAN PROGRESS NOTES

| amily Name | First Name | Attending Physician | Room No. | Adm. No. |
|------------|------------|---------------------|----------|----------|
| Campolo | Joseph | Bregos | | |

| Date | Notes Should be Signed by Physician |
|------|-------------------------------------|

3/22/2- | 47 yr BM with a PMH of PCP, HCV, lymphoma Renal failure and tumor lysis syndrome Admitted to B&W hospital with a change in mental status Found to have diffuse malignant lymphoma He was transfered to GJ hm for comfort care

No ROS- unresponsive

Family hx - ...

Social hx- Confirmed

PE - See H&P

A/P - Lymphoma - comfort care

PCP - DDx + staff.

HBV

3/23/05  S: Asked to see pt who is terminally ill
He is comatose c̄ Cheyne Stokes respirations
There is no response but his resp are labored
He is currently being medicated c̄ MS 4mg
q 1°

O - Comatose - labored breathing - Temp 97²-
Heart - 88 reg        100/60    ²⁶ys m)
Chest - RR 12 ⟶ 16 - access sp whngs
Upper airway rhonchi

# DISCHARGE SUMMARY

Hosp. No.: 7967

Last Name: *Pumphili Joseph*    Date & Time of Admission: 3/21/05    6²⁴ p

Attending Physician: *Dr. Bregoli*    Date & Time of Discharge: 3/23/05    205 p

ADMITTING DIAGNOSIS: *T-Cell Lymphoma, Sec Malig. Neo Nerve, Encephalopathy, Acute Renal Failure*

BRIEF HISTORY OF NURSING HOME STAY: *Pt adm to Col NH for jtbos al caie. He did here at expird prognly*

CONDITION AT TIME OF DISCHARGE (Physical & Mental): *Pt expird*

DISCHARGED TO: *Cartwright Funeral Home 419 No. Main Street, Randolph MA 02368*

FINAL DIAGNOSIS: *Lymphoma*    202.10

PROGNOSIS: *Pt expird*

Date: 3/23/05    Signed: _____ M.D.

WHF-NUR-141    1/94

# ADMISSION ASSESSMENT

| Section A | | IDENTIFICATION AND BACKGROUND ASSESSMENT | |
|---|---|---|---|
| 1. | Resident Name | Last: *PAMPHILE*    First: *JOSEPH*    MI: | |
| | Medical Record # | Record # | |
| 2. | Physician | Name: *DR ARTHUR BREDOLI* | |
| 3. | Date of Admission | *3 / 31 / 05*    Time: *6:45 pm*    Sex: ✔ Male<br>DOB: *1 · 26 · 58*    Age: *47*    ___ Female | |
| 4. | Source of Information | a. Resident          b. Family<br>0.___ No          0.___ No    2.___ No Family<br>1.___ Yes          1. ✔ Yes | |
| | Primary Language | ___ English          ___ Other (specify) _____ | |
| 5. | Admitted From<br><br>AB2 | 0. ✔ Private home or apt.  3.___ TCU<br>1.___ Nursing facility    4.___ Rehab hosp<br>2.___ Acute care hosp    5.___ Other<br>*Followed by SS Hospice* | |
| 6. | Accompanied by | 0. ✔ Family          2.___ Self<br>1.___ Friend          3. ✔ Other  Name: *Hospice Nurse* | |
| 7. | Transported Via | 0. ✔ Stretcher    1.___ Ambulatory    2.___ Wheelchair | |
| 8. | Orientation<br><br>Check indicates education provided and resident/family understood information | (Check all that apply) *explained to family*<br>a. ✔ Call Light    b.___ Telephone   c. ✔ Roommate/Staff   d. ✔ TV<br>e. ✔ Visiting Hours   f.___ Laundry   g. ✔ Lighting   h.___ Bed Control<br>i. ✔ Unit Set Up   j. ✔ Daily Schedule   k. ✔ Activities<br>l. ✔ Bathroom   m.___ None of the Above | |
| 9. | Advance Care Directives<br><br>A10 | DNR ✔ (Yes) ___ No    Health Care Proxy (Yes) ___ No<br>Comfort Care ✔ (Yes) ___ No  Organ/Tissue Donor ___ Yes  ___ No Other *DNH* | |
| 10. | Reason for admission to facility, in resident's own words<br><br>Resident's perceptions and expectations | What do you feel you need to accomplish during your stay? *Comfort care*<br>Pre-admission functional level ___ same ___ better ___ worse<br>Problems with Safety Awareness  ( ) Yes  ( ) None Identified at This Time | |
| 11. | Vital Signs | a. *97.7* Temp.  c. B/P *110/48* ___ lying ___ sitting ___ standing<br>b. *64* Apical Pulse Rate  d. *20* Respirations<br>*O2 Sat 96% RA* | |
| 12. | Height and Weight<br>K2 A&B | (Record actual height in inches and weight in pounds)(Must be weighed and measured in the facility)<br>a. ___ Height  b. ___ Weight | |
| 13. | Vaccine Information | History of receiving flu vaccine  Yes___ No___ Date if known ___<br>History of receiving pneumonia vaccine Yes___ No___ Date if known ___<br>History of receiving tetanus vaccine Yes___ No___ Date if known ___<br>*R unknown per family* | |

**WHF-NUR-102A**

6/04

Ex. 9 p. 8

Resident Name:

| Section C | ORAL ASSESSMENT | Special Needs |
|---|---|---|
| __ LYMPH NODES: No enlargement | __ Enlarged __ Tender __ Swollen | |
| __ LIPS: Smooth, pink, moist | ✓ Dry __ Chapped __ Red __ Bleeding __ Coated | Last Dental Exam_____ Reason for Exam |
| ✓ TONGUE: Normal roughness, pink and moist | __ Red __ Bleeding __ Coated __ Ulcerations | |
| ✓ GUMS: Pink, small indentations; firm, smooth and pink under artificial teeth | __ Red __ Swollen __ Bleeding __ Ulcerations | |
| ✓ TEETH (Natural): No decayed or broken teeth/roots | __ No Teeth __ Loose Teeth __ Missing or Broken Teeth __ Plaque build-up __ Food build-up | |
| __ TEETH (Artificial) Unbroken teeth, worn most of the time | __ None __ Full Upper __ Full Lower __ Partial Upper __ Partial Lower Dentures are worn: __ Usually __ Sometimes __ Rarely __ Never Denture Condition: Upper __ Adequate __ Broken/Missing Teeth Lower __ Adequate __ Broken/Missing Teeth | |

Number of natural teeth_____ None___
Upper dentures labeled: __Y __N __None   Lower dentures labeled: __Y __N __None

Is your mouth comfortable? __Y __N   If no, please explain:_____

Functionally, is the patient/resident able to chew? ? __Y __N   With dentures_____  Without dentures _____
Comments: NPO, Comfort care, Non-responsive   RN Signature: _____

| Section D | RESPIRATORY ASSESSMENT | |
|---|---|---|
| __ Respirations within normal rate for age, quiet and regular. No rales/wheezes | __ Shortness of breath (caused by?) __ Cough productive ( )Yes ( ) No Color _____ Orthopnea __Hemoptysis __Pain _____Asthma | |
| Smoking History: __ Never Smoked | Smoked in Last year Yes_____No_____ Current Smoker Yes___No___ PHYSICAL FINDINGS: Lung sounds:__Diminished __Wheezes __Rales __Ronchi Other: #Pillows to sleep___ O2 at___L/min Trach size/type_____ date last changed_____ O2 sat | |

| Section E | PAIN ASSESSMENT | |
|---|---|---|
| __ Resident denies pain of any kind. Assessor sees no signs of pain demonstrated by resident. | 72 hour Screening Assessment must be initiated on admission | |

Resident Name: _Pamphile, Joseph_

| Section F | TUBERCULOSIS SCREENING  Have you ever had TB | | yes | no |

Do you currently have  _Comfort Care, non-responsive,_

| | | | | | |
|---|---|---|---|---|---|
| 1. Unusual Fatigue | ___Yes ___No | 4. Persistent Cough (Longer than 2 weeks) | | ___Yes ___No |
| 2. Weight Loss | ___Yes ___No | 5. Blood streaked sputum | | ___Yes ___No |
| 3. Loss of Appetite | ___Yes ___No | 6. Night sweats | | ___Yes ___No |

Have you ever had a positive TB Test?  ___Yes ___No  If yes date and type (PPD)_____ (CXR)_____
Ever had a reaction to a TB Test?  ___Yes ___No

If Yes, explain: _____

Ever had a treatment for TB?  ___Yes ___No
If Yes, explain (include drugs): _____

Has a family member ever had TB?  ___Yes ___No
If Yes, who: _____

| Section G | CARDIOVASCULAR ASSESSMENT |

___Cardiovascular.
Apical pulse regular and
rate within range for age.
No dependent edema.
Nailbeds and mucous
membranes pink

CARDIOVASCULAR
___Arrhythmia  ___Chest Pain  ___Hx of HTN  ___heart disease
___Ankle Edema  ___L  ___R  ___Palpitations  ___Tachycardia
___Bradycardia  ___Pace Maker
Type:_____
Rate:_____
Date Last Checked _____

_hx HTN_

PHYSICAL FINDINGS:
___Numbness  ___Tingling  ___Weak Pulses  ___Absent Pulses
___Jugular Vein Distention
Other:

| Section H | MENTAL ASSESSMENT |

___Mental: Alert and
oriented to time, place, and
name. Responds
appropriately
Communication is adequate
for expression of needs.
Short Term and Long Term
Memory intact.

MENTAL STATUS (Check all that apply):

___Alert  ___Forgetful  ___Lethargic  ___Anxious  ___Noisy
___Demanding  ___Sociable  ___Quiet  ___Friendly
___Depressed Mood  ___Withdrawn  ___Diagnosis of MR/MI
___Impaired Long Term Memory **Ba2b**  ___Impaired Short Term Memory
**B2a**  ✓ Unresponsive/Comatose  **B1**  ___Unable to Respond to Painful
Stimuli
Disoriented to:  ___Time  ___Place  ___Person
___Behavior Appropriate
___Inappropriate (detrimental to life/comfort of self or others)
___Inappropriate (not a major management problem)
Answers Questions: ___Readily  ___Reluctantly  ___Inappropriately
Specify any change in orientation in last 30 days_____

_____Psych
Consult Needed:

| Section I | NEUROLOGICAL ASSESSMENT |

___NEUROLOGICAL
WNL
No numbness, No tingling
No paralysis
No noticeable weakness
Pupils equal and reactive to
light

NEUROLOGICAL: (Check all that apply)
___Epilepsy  ___Hx of Strokes  ✓Pain  ___Fainting Spells/Dizziness
___Headaches  ___Stroke  ___Weak Hand Grasps  ___Unequal Pupils
___Seizures (How controlled)_____
___Numbness/Tingling (Location)_____
___Speech Problems  ___Other

Resident Name: _____

| Section J | MUSCULOSKELETAL ASSESSMENT | |
|---|---|---|

__ Musculoskeletal ROM
● WNL
Ambulates independently
without device or assistance.
No swelling or pain in joints

Gait Steady

MUSCULOSKELETAL (Check all that apply)
__Unsteady Gait  __Pain  __Wound  __Cast/Sling
__Fractures/Dislocation  __Back Problem  __Deformity __Gout
__Arthritis/Unstable Joints/Stiffness

Weight Bearing:                          Right  Left
       Full                              ___    ___
       Partial                           ___    ___
       Touchdown                         ___    ___
       Non weight bearing                ___    ___

*(handwritten note on highlighted area)* Bed rest attempting to non-responsive

Precautions/Restrictions_____
Prosthesis/Aides_____

Extremities:  RU  LU  RL  LL
Weakness    ___ ___ ___ ___
Paralysis   ___ ___ ___ ___
Contractures ___ ___ ___ ___
       ___Needs assist with bed mobility
Locomotion:
__Amb. Ad Lib   __Up in Chair __For short time   __For most of day
Ambulate with help of __1 Assist __2 Assist
__Walker __Cane __Brace
About in W/C __Ind __Dep
       __Wanders, usual distance:_____

| Section K | NUTRITION ASSESSMENT |
|---|---|

__Nutritional WNL
● Consistently eats >75%
Weight WNL
Fluid intake>1000 cc/24 hrs.

Diet at home: *O restrictions*
Hx. Diabetes _____ __yes __no      *(handwritten) UV HN*
Eating habits limited by condition of teeth:
Specify:_____
Swallowing __No difficulty __Some difficulty
Chewing __No difficulty __Some difficulty
Feeding Skills:
__Feeds self __Assist Needed __Dependent

Weight Change:
__Loss __Gain   Approximate Amount_____
Time Frame:_____
Food Dislikes:_____

| Section L | GASTROINTESTINAL ASSESSMENT | |
|---|---|---|

__GI WNL
BM at least 2x week
Normal color or consistency
of stool
Continent

*N/A*
__Ostomy _____Type/Size of appliance
__Continent  __✓Incontinent
__Loss of appetite/taste __Thirst __Nausea/Vomiting
__Heartburn __Constipation __Diarrhea
Laxative Used:_____
__Distention __Abdominal Pain __History of Hepatitis

Date of last Bowel Movement:_____

Other:_____

If incontinent, history of
constipation, current use
of Narcotics or other
constipating drugs, place
on Bowel Regulation
Program

Resident Name: _Pamphile, Joseph_

## FALL RISK ASSESSMENT

**Section M**

0-7 Low Risk, 8 or greater high risk. Any resident scoring a 2 on either awareness level or mobility is high risk. Residents having _____ Syncope _____ Fear of Falling _____ Incontinence or an _____ acute illness, infection, delirium or dehydration are automatically considered at high risk

| | | | | |
|---|---|---|---|---|
| Age | 0. less than 80 | 1. 80 or greater | | (Enter a 0 or 1 for age) |
| Assistive Device in Use; W/C, Walker, Cane | 0. No device needed | 1. Independently uses devices | 2. Requires assistance with device | N/A |
| Awareness Level | 0. Understands and follows directions | 1. Consistently follows simple directions | 2. Does not follow or inconsistently follows directions | 2 |
| Physical Status | 0. Good muscle strength | 1. Specific or general weakness | 2. Paralysis Contractures Amputations | 1 |
| Weight Bearing Status | 0. Full weight bearing | 1. Partial weight bearing | 2. Non-weight bearing | 2 |
| Mobility | 0. Independently ambulates. No history of falls in last 3 months or fx in last 180 days | 1. Ambulates with assist or an unsteady gait. No history of falls in last 3 months or Fx in last 180 days | 2. Does not ambulate or experienced a fall within last 3 months or Fx in last 180 days | 2 |
| Transfer Ability | 0. Independent | 1. Supervised | 2. Assist | 2 |
| Vision | 0. Good | 1. Impaired | 2. Blind | 0 |
| Hearing | 0. Good | 1. Impaired | 2. Deaf | 0 |
| Medications<br><br>Resident receiving 1 or more of these meds score a 1 | 0. Does not apply | 1. Antihypertensives<br>Cardiotonics<br>Narcotic Analgesics<br>Diuretics<br>Antiemetics<br>Sedative Hypnotics<br>Antipsychotics<br>Antidepressants<br>Antihistamines<br>Anti-Anxiety<br>Eye-Drops<br>Anticonvulsives<br>AntiParkinson<br>Nsaid"s | | 1<br>(Enter a 0 or 1 for meds) |
| Depression | 0. No active diagnosis | 1. Current diagnosis of depression | | 0<br>(Enter a 0 or 1 for depression) |
| ADL | 0. Independent | 1. Dependent in 1 ADL | 2. Dependent in 2 ADL | 2 |
| | | | TOTAL SCORE: | 12 |

6

Ex. 9 p. 12

Resident Name: _Pamphile, Joseph_

| Section N | NORTON PLUS PRESSURE ULCER SCALE | | | | Score |
|---|---|---|---|---|---|
| Physical Condition | 4. Good | 3. Fair | 2. Poor | 1. Bad | 1 |
| Mental State | 4. Alert: Aware of person, place, and time | 3. Apathetic | 2. Confused | 1. Stupor | 1 |
| Activity | 4. Ambulant: | 3. Walks with help: | 2. Chairbound | 1. Bedrest | 1 |
| Mobility | 4. Full: | 3. Slightly Limited: | 2. Very Limited: | 1. Immobile: | 2 |
| Incontinent | 4. Not | 3. Occasional: | 2. Usually: | 1. Always | 1 |
| NORTON SCORE: | | | | | 6 |

| NORTON PLUS DEDUCTIONS (CHECK IF YES): | |
|---|---|
| Diagnosis of Diabetes | |
| Diagnosis of Hypertension | ✓ |
| Hematocrit (in last 90 days) (M): less than 41% (F): less than 35% | |
| Hemoglobin (in last 90 days) (M): less than 14 g/dl (F): less than 12 g/dl | |
| Albumin Level (in last 90 days) Less than 3.3 | |
| Febrile: greater than 99.6 | |
| 5 or more prescription medications | |
| Change in Mental Status to Confused-Lethargic Within 24 Hours | |
| TOTAL NUMBER OF CHECK MARKS FROM ABOVE: | 1 |
| NORTON SCALE SCORE: | 6 |
| MINUS TOTAL CHECK MARKS FROM ABOVE: | -1 |
| TOTAL NORTON PLUS SCORE: | 5 |

| NOTE: | 16 – 20 | No Risk or Low Risk |
|---|---|---|
| | 11 – 15 | Moderate Risk |
| | 10 or Less | High Risk |

NURSE'S SIGNATURE: _____    Date: 3/31/05

*Source: Norton, D., McLaren, R., and A.N. Exton-Smith. An Investigation of Geriatric Nursing Problems in Hospitals. 1975.*

Welch Healthcare & Retirement Group

Patient /Family Education Assessment Record

*Joesph Pamphile*

| ██████████ | ██████████ |
|---|---|

tients readiness to learn (if no, describe reason)

| ability to understand written rections | Learner: | 1. *Resident* | 1. __ Y  ☒ N | Patient/Family preferred teaching method: |
|---|---|---|---|---|
| | | 2. *Girlfriend* | 2. ☑ Y __ N | __ Printed materials |
| | | 3. __ | 3. __ Y __ N | ☑ Explanation |
| | | 4. __ | 4. __ Y __ N | __ Demonstration |
| | | | | __ Other |

|  | Yes | No |  | Yes | No |  | Yes | No | Specify for yes |
|---|---|---|---|---|---|---|---|---|---|
| Physical | ✓ | | Age Related | | | Emotional | | | |
| Language | | | Sensory(visual) | | | Motivation | | | |
| Religious | | | Sensory(Auditory) | | | Financial | | | |
| Cultural | | | Cognitive | | ✓ | Other | | | *Coma* |

Signature/Title *Kuunyo Brown RN*    Date 3/24/05

---

| ██████████ | ██████████ |
|---|---|

tients readiness to learn (if no, describe reason)

| bility to understand written rections | Learner: | 1. __ | 1. __ Y __ N | Patient/Family preferred teaching method: |
|---|---|---|---|---|
| | | 2. __ | 2. __ Y __ N | __ Printed materials |
| | | 3. __ | 3. __ Y __ N | __ Explanation |
| | | 4. __ | 4. __ Y __ N | __ Demonstration |
| | | | | __ Other |

|  | Yes | No |  | Yes | No |  | Yes | No | Specify for yes |
|---|---|---|---|---|---|---|---|---|---|
| Physical | | | Age Related | | | Emotional | | | |
| Language | | | Sensory(visual) | | | Motivation | | | |
| Religious | | | Sensory(Auditory) | | | Financial | | | |
| Cultural | | | Cognitive | | | Other | | | |

Signature/Title      Date

# NURSES NOTES

NAME _Joseph Vanguis_   ADM. NO. _____   DATE _3/21/05_

| Date | Time | | Sig. |
|------|------|---|------|
| 3/21/05 | 3P-11P | Pt. admitted to CNRPC Rm 217B from home accompanied by family & Hospice nurse. Hospice recs called to covering MD Dr Dalton - all orders confirmed. PMH includes Non-hodgkins lymphoma, renal failure, encephalopathy, s/p lumbar puncture, HTN. T 97, BP 110/48, P 64, R 20, O₂ Sat 96% R/A LSC ⊕ bowel sounds 4 quads ⊕ 4 BLE edema - see initial neg skin assessment. Unresponsive to verbal / tactile stimuli, resting in bed and then suddenly sat upright & attempted to stand, eyes wide, speech unintelligible, restless, med c̄ MSO₄ 4mg SC and Phenobarbital 60mg IM for s/sx of pain. Restlessness c̄ effect. Personal alarm in place for safety, family / friends in visiting. ~B Kelly | |
| 3/22 | 11-7 | VS O₂ Sat 94% RA, AP 73, R 18 ~ B/12, V 98/50 unresponsive c̄ ↑ agitation. Care & comfort measures. MSO₄ 4mg SC x̄ for pain mgmt. Safety maintained T 97. Girlfriend was updated on residents condition @ 630 AM. Bil feet edematous. Skin D+I. Resident DNI this shift. NPO. T+R Q2° ~ Keeley RN | |
| 3/22/05 | 7:30 | 9AM VS T 98⁸ 110/60 80 RRx 98% on R/A. Unresponsive to verbal or painful stimuli. No noted laboral breathing. Lung sounds clear. Hospice in to see pt. Remained unresponsive entire shift. 12PM T 98⁷ 118/60 91 18 96% T+R q 2°. Dr. Dugall in to see pt. Cond on comfort care. NPO. Required po SC morphine this shift. No void. Jane ___ RN | |

## NURSES NOTES

ADM. NO. _____   DATE _____

| Time | | Sig. |
|------|--|------|
| 3-22-05 | comfort care cont. absates 90x42i. | |
| 3-11-05 | puts 703 Treatment was agitated | |
| | Tlc was mr vr Gladstone for dr. Bregou | |
| | 710 give morphine sulfate 4mg q1hour prn. | |
| | morphine sulfate given ↑ good effort. | |
| | restlessness resolution. Family in | |
| | emotional support given. Repositioning | |
| | q ↑ 1 to 7 hours. mouth care given. | |
| | — C. Villarin | |
| 3-23-05 | 11-7 Pt. remains unresponsive c̄ labored Resp. but | |
| | not Rapid. M.S. given S.C. A10 X 5 this shift | |
| | for labored Resp. ↑ in secretions noted — Pt. | |
| | not swallowing. comfort care - mouth care. C. Reardon ? rn | |
| 3/23 | Pt unresponsive - medicate q1°c M5O4 - | |
| 7-3 | scopolamine patch on. ✗ urine pt's | |
| | significant other in @ 1⁵⁵ ✗ expired | |
| | @ 2:05 P. D. Lifford ? rn | |
| 3/23 | Expire released to Cartwright | |
| 1:6⁴⁰ | Juteral home | |

# HOSPICE CARE PATH ©

PHASE 2
(VISITS FOR INTERMEDIATE STAGE)

Patient Name: _Joseph Pamphile_

ID#: _24,91_

Date: _3/23/05 1050AM_

| CARE ELEMENTS | INTERVENTIONS: Use "✓" for complete; "?" for not done and "N/A" as appropriate. | COMMENTS |
|---|---|---|
| CARDIOVASCULAR AND RESPIRATORY | Assess dyspnea ✓ Assess need for oxygen therapy Place in home (as ordered) and educate re: maintenance and safety, give handout and document in medication profile Assess for increased secretions and inability to clear secretions ✓ Teach aspiration precautions ✓ | VS: T ___, HR 80 R/I. R/I. RR 16, BP 96/54 Edema: L 4+, R 4+ Lungs: L Rhonchi, R Rhonchi Wearing 2L O2 Scopalamine patch intact Does not appear in any distress @ this time Scopalamine helpful to ↓ resp secretions |
| GI/GU AND NUTRITION/ HYDRATION | Assess for nausea, vomiting, anorexia ✓ Assess changes in elimination patterns ✓ Instruct on diet requirements for a dying person, decreased desire to eat or drink ✓ Assess for dysphagia ___ Assess oral cavity and S/S candidiasis and teach oral care ___ Assess need for Foley catheter ___ Place (as ordered) and give handout ___ Assess for dehydration ___ Assess need for IV therapy and make appropriate referrals ___ | LBM 3/19 Foley catheter size N/A Fr ___ cc/balloon NPO 2⁰ to unresponsive ↓ urine output Abdomen distended |
| NEURO | Assess orientation, LOC, confusion, lethargy, hallucinations, wandering ✓ Assess sleeping patterns ___ Assess for S/S seizure activity Teach seizure precautions ___ | Unresponsive ē agitation noted for several hours |
| ENDO | Assess for signs/symptoms of hypo/hyperglycemia ___ Assess knowledge of diabetic management, and teach per knowledge deficits (give handout): N/A | |
| PAIN AND MEDICATIONS | Assess pain/pain management and instruct on comfort measures ___ Reorder medications as needed ___ Instruct re: changes and update home medication profile ___ Instruct purpose, action, side effects of the following medications: ___ | PAIN 0 1 2 3 4 5 6 7 8 9 10 SCALE Unable to rate pain on scale presently appears to be comfortable Present regimen is Morphine 4 mg Subcutaneous Q1⁰ |
| SKIN | Perform wound care (as ordered, add Skin Care Protocol to record, give handout) and teach signs and symptoms of infection ✓ Teach to change position frequently and potential for skin breakdown ✓ Teach incontinence care ___ Assess IV access site for signs and symptoms of infection N/A | Skin dry warm to touch Intact |
| COPING AND PSYCHOSOCIAL | Assess Patient/Family coping and anxiety ✓ Encourage verbalization of fears, anger, sadness and offer emotional support ✓ Determine high risk caregivers/family for bereavement follow up ___ Assess respite needs ___ Provide volunteer respite care (as needed) ___ Patient's predominant mood/affect: anxious ___ lonely ___ regretful ___ tearful ___ angry ___ irritable ___ depressed ___ flat ___ pleasant ___ sad ___ calm ___ other ___ | Patient had visit from the priest Pts case manager Greg Graham will contact Pts Primary Care Give Chantelle to help ē coping IN |

# HOSPICE CARE PATH ©

**PHASE 2**
(VISITS FOR INTERMEDIATE STAGE)

Patient Name: _Joseph Pamphile_

ID#: _2491_

Date: _03/22/05_

| CARE ELEMENTS | INTERVENTIONS: Use "✓" for complete, "0" for not done and "N/A" as appropriate. | COMMENTS |
|---|---|---|
| **CARDIOVASCULAR AND RESPIRATORY** | Assess dyspnea ✓ Assess need for oxygen therapy ✓ Place in home (as ordered) and educate re: maintenance and safety, give handout and document in medication profile _N/A_ Assess for increased secretions and inability to clear secretions ✓ Teach aspiration precautions _Pt. is NPO_ | VS: T _98.8 Aur_ HR _80_ R/I. R/I. RR _10_ BP _101/60_ Edema: L _5+_ R _5+_ Lungs: L _____ R _____ Scattered Rhonchi Bilaterally, No Known cardiac Hx but pt. has systemic lymphoma with involvement of spleen, GI, urethra and kidney. Would treat for rales or wet breath sounds. Use Scopolamine patch 0.75 TPH and LORS in Bid 5mg SC q4hr |
| **GI/GU AND NUTRITION/ HYDRATION** | Assess for nausea, vomiting, anorexia _____ Assess changes in elimination patterns _____ Instruct on diet requirements for a dying person, decreased desire to eat or drink _____ Assess for dysphagia _____ Assess oral cavity and S/S candidiasis and teach oral care _____ Assess need for Foley catheter _____ Place (as ordered) and give handout _N/A_ Assess for dehydration _____ Assess need for IV therapy and make appropriate referrals _N/A_ | LBM _3/19_ Foley catheter size _N/A_ cc/balloon V. pain Rx since last, NPO now mouth care given Markedly decreased bowel sounds Abd. subscend, very hard over (L) mid abdomen |
| **NEURO** | Assess orientation, LOC, confusion, lethargy, hallucinations, wandering _____ Assess sleeping patterns _____ Assess for S/S seizure activity _____ Teach seizure precautions _N/A_ | Pt. is obtunded at this time had been having some agitation at home, it reveals failure and end of life changes. S prob.s |
| **ENDO** | Assess for signs/symptoms of hypo/hyperglycemia _____ Assess knowledge of diabetic management, and teach per knowledge deficits (give handout): _N/A_ | |
| **PAIN AND MEDICATIONS** | Assess pain/pain management and instruct on comfort measures _____ Reorder medications as needed _____ Instruct re: changes and update home medication profile _____ Instruct purpose, action, side effects of the following medications: _Pt. is on 5mg MSO4 SC q2° and glycopyrrolate 30-60 SC q2°_ would cont. this doses and prn's if pt. shows agitated, would increase by 30% | PAIN (0) 1 2 3 4 5 6 7 8 9 10 SCALE Pt. has not had pain during this decline. Continued sedation is the primary comfort measure at this point, pt. is no longer able to take PO and will gradually decline. Good sedation level at this time. Have consulted with our hospice pharmacist. No contraindications noted. |
| **SKIN** | Perform wound care (as ordered, add Skin Care Protocol to record, give handout) and teach signs and symptoms of infection _N/A_ Teach to change position frequently and potential for skin breakdown _____ Teach incontinence care _____ Assess IV access site for signs and symptoms of infection _N/A_ | Skin is very dry - Lotion being applied - would suggest continue every 8° |
| **COPING AND PSYCHOSOCIAL** | Assess Patient/Family coping and anxiety _____ Encourage verbalization of fears, anger, sadness and offer emotional support _____ Determine high risk caregivers/family for bereavement follow up _____ Assess respite needs _____ Provide volunteer respite care (as needed) _N/A_ Patient's predominant mood/affect: anxious _____ lonely _____ regretful _____ tearful _____ angry _____ irritable _____ depressed _____ flat _____ pleasant _____ sad _____ calm _____ other _____ | Pt.'s PCG Chantelle is very pleased and grateful for the admission someone to the colonial. She is tearful in accepting of pt.'s rapid decline |

# SOUTH SHORE VISITING NURSE ASSOCIATION

COMMUNICATION RECORD

Page # _____

NAME: Joseph Pamphile

I.D. #:  24191

03/21/05
7³⁰ᵖ     Pt. has been Rapidly declining for several days.
He was seen this AM by Gina Tempesta MSW at
home with his PCG Chantelle Thomas.
As per phone conversations with pt's Doctor at
Dana Farber DR Rachael Rosovsky, and visits
by myself and Gina Tempesta, pt is affirmed as
a DNR/DNI.  This is well documented in the
D/c Summary placed in the chart from BI'W Hosp.
We provided a copy of the health care proxy signed
By Joseph Pamphile designating Chantelle as
his decision maker.
He is admitted to Colonial NSG facility this
eve for general inpatient end of life
Care for comfort and symptom management.
He is experiencing end of life agitation.
This could also be as a result of his acute
Renal failure as well.
                              — Trey Graham RN
                              Case manager, Hospice of the
                              South Shore

# HOSPICE CARE PATH ©

PHASE 2
(VISITS FOR INTERMEDIATE STAGE)

Patient Name: _Joseph Pamphile_

ID#: _2191_

*Any questions about prior care
please call Dr Rachael Rosovsky
@ Dana Farber 617 632-3899 (3779)*

Date: _03/21/05_

| CARE ELEMENTS | INTERVENTIONS: Use "✓" for complete; "0" for not done and "N/A" as appropriate. | COMMENTS |
|---|---|---|
| **CARDIOVASCULAR AND RESPIRATORY** | Assess dyspnea ✓ / Assess need for oxygen therapy ✓ / Place in home (as ordered) and educate re: maintenance and safety, give handout and document in medication profile ✓ / Assess for increased secretions and inability to clear secretions ✓ / Teach aspiration precautions ✓ | VS: T ___ HR _48/60 R/1 62_ / R/1, RR _8_ BP _110/6_ / Edema: L _41_ R _41_ / Lungs: L _c0_ R _0_ / No resp distress no Rales or Rhonchi. / No cardiac hx except for Hypertension / R/1 ē Atenolol. / Pt has been a Body builder recently in the past. Resp rate Unknown |
| **GI/GU AND NUTRITION/ HYDRATION** | Assess for nausea, vomiting, anorexia ✓ / Assess changes in elimination patterns ✓ / Instruct on diet requirements for a dying person, decreased desire to eat or drink ✓ / Assess for dysphagia ✓ / Assess oral cavity and S/S candidiasis and teach oral care ✓ / Assess need for Foley catheter ___ Place (as ordered) and give handout ___ / Assess for dehydration ✓ / Assess need for IV therapy and make appropriate referrals N/A | LBM _3/1/x_ Foley catheter size _N/A_ Fr ___ cc/balloon / Very poor po past 3 days, Very Small voids, bladder not distended only sips of fluids. Pt is in Renal failure, s/p chemo 3 mos ago. attempts at Foley placement unsuccessful |
| **NEURO** | Assess orientation, LOC, confusion, lethargy, hallucinations, wandering ✓ / Assess sleeping patterns ✓ / Assess for S/S seizure activity ✓ / Teach seizure precautions ✓ | Pt is non verbal today, Thinching/ screaming, very confused / somnolent at times, unable to stand with safety. Pt needs 24° supervision at home |
| **ENDO** | Assess for signs/symptoms of hypo/hyperglycemia ✓ / Assess knowledge of diabetic management, and teach per knowledge deficits (give handout): _N/A_ | S. prob. |
| **PAIN AND MEDICATIONS** | Assess pain/pain management and instruct on comfort measures ✓ / Reorder medications as needed ✓ / Instruct re: changes and update home medication profile ✓ / Instruct purpose, action, side effects of the following medications: / Mild agitation not improved / ē Ativan. / Would suggest changing / to MSO4 2-4mg SQ Q2-4° / Phenobarb 30-60mg SQ Q° / Compazine 25mg supp Q6° / prn nausea, agitation/pain | PAIN SCALE (0) 1 2 3 4 5 6 7 8 9 10 / 1:30p given MSO4 5mg ē 1mg Ativan, / 2:30p MSO4 10mg ē 1mg Ativan / 4:30p MSO4 10mg ē 1mg Ativan / 5:30p Compazine supp 25mg prn nausea |
| **SKIN** | Perform wound care (as ordered, add Skin Care Protocol to record, give handout) and teach signs and symptoms of infection ✓ / Teach to change position frequently and potential for skin breakdown ✓ / Teach incontinence care ✓ / Assess IV access site for signs and symptoms of infection N/A | warm, very dry / Some itchiness of arms + legs - lotion applied frequently |
| **COPING AND PSYCHOSOCIAL** | Assess Patient/Family coping and anxiety ✓ / Encourage verbalization of fears, anger, sadness and offer emotional support ✓ / Determine high risk caregivers/family for bereavement follow up ✓ / Assess respite needs ✓ / Provide volunteer respite care (as needed) ___ / Patient's predominant mood/affect: / anxious ___ lonely ___ regretful ___ tearful ___ / angry ___ irritable ___ depressed ___ flat ___ / pleasant ___ sad ___ calm ___ other ___ | Pt's PCG Chantelle is exhausted, Lives alone at home. Pt not settled at Nite, many nights Recently. Pt is estranged from wife Ruth Pamphile and has a past Restraining order against him - will get a copy from Brigham + women's hospital for chart + chem al |

3/23/05

# HOSPICE CARE PATH ©

PHASE 2 *continued*

Patient Name: Joseph Pamphille
ID#: 12X191

| CARE ELEMENTS | INTERVENTIONS: Use "✓" for complete, "0" for not done and "N/A" as appropriate. | COMMENTS |
|---|---|---|
| ACTIVITY AND SAFETY | Assess activity level, environment for risk factors and potential for injury ✓ Review hospice protocol, when and how to contact hospice staff ✓ Add equipment (as needed and document on Cover Sheet) and teach safe use ✓ Assess / teach need for baby monitor N/A Instruct side rails up while in bed ✓ Teach to assist with ambulation and transfers at all times N/A HHA Supervision Pt. satisfied? Y☐ N☐ Home situtation changed? Y☐ N☐ Personal care given? Y☐ N☐ Service change? Y☐ N☐ Increase☐ Decrease☐ | Bedbound ☑ Not Bedbound ☐ Pt. will be much safer in Nursing Home setting where he can have supervision and frequent NSG. assessments |
| TREATMENTS | As ordered N/A N/A IV Care: access type as per NSG staff & MD Orders: | Several consults today with Dona Pompey & MSW who has closely followed pt. with me |
| INTERTEAM SERVICES / COMMUNITY REFERRALS | Case conference: MSW ✓, Chaplain ___ Volunteer ___, HHA ___, PT ___, OT ___ SLP ___, CETN ___, Psych RN ___ IV Home Infusion Coordinator ___ Make community referrals as needed ___ | |

| PATIENT OUTCOMES | Met | Not Met | Explain variance code identified in "not met" column. |
|---|---|---|---|
| 1. Pt/Cg verbalizes hospice protocol and when and how to contact hospice staff. | ✓ | | |
| 2. Pt/Cg verbalizes purpose, action, side effects of each medication instructed. | ✓ | | |
| 3. Pt/Cg demonstrates compliance with medication schedule. | ✓ | | |
| 4. Pt verbalizes an acceptable level of pain control. | ✓ | | |
| 5. Pt/Cg verbilizes dietary/hydration needs of the dying person. | ✓ | | |
| 6. Pt maintains activity as tolerated. | ✓ | | |
| 7. Pt/Cg verbalizes / demonstrates that emotional needs are being met. | ✓ | | |
| 8. Pt/Cg verbalizes that support services are meeting expressed needs. | ✓ | | |
| 9. Pt/Cg demonstrates safe use of equipment. | ✓ | | |

If unmet outcomes from previous phases have now been met, write phase or outcome numbers:

**Plan for next visit:** Assess comfort level, c/v, Resp status family coping

**Physician Contact:** Delotha Duffey RPN to contact Dr Dalton for Ada, and med orders, cover for Dr Bergoli.

**Outcome of MD Contact:** Also suggest Scopolomine patch for resp. secretions with Levsin 0.125mg SL Q4-6° prn

**Additonal Comments:** I will follow closely with you. I have advised the nurse in charge that Hospice Nurse(s) are available 24°/day for consult and I will see pt. here as well. 781-843-0947 — page me (days) or on call RN

| Signature and Title: Grey Graham RN | Date: 03/21/05 | Revisit Date: 03/23/05 |
|---|---|---|

# SOUTH SHORE VISITING NURSE ASSOCIATION

## COMMUNICATION RECORD

Page # _____

NAME: Joseph Pamphile

I.D. #: 24191

03/21/05
7³⁰ᵖ  Pt. has been Rapidly declining for several days.
He was seen this AM by Gina Tempesta MSW at
home with his PCG Chantelle Toussin.
As per phone conversations with pt's doctor at
Dana Farber DR Rachael Rosovsky, and visits
by myself and Gina Tempesta, pt is affirmed as
a DNR, DNI. This is well documented in the
D/c Summary placed in the chart from BW hosp.
We provided a copy of the health care proxy signed
By Joseph Pamphile designating Chantelle as
his decision maker.
He is admitted to Colonial NSG facility this
eve. for general inpatient end of life
Care for comfort and symptom management.
He is experiencing end of life agitation
this could also be as a result of his acute
Renal failure as well.
        — Greg Graham RN
        Case manager, Hospice of the
        South Shore

## REPORT OF CONSULTANT

| Family Name | First Name | Middle Name | Adm. No |
|---|---|---|---|

| From: Attending Physician | To: Consultant | Date |
|---|---|---|
| | REGINA TEMPESTA LICSW | 3/23/05 |
| | Hospice Social Worker | |

Report requested regarding  Joseph Pamphile          (Regina Tempesta LICSW)

(in lieu of Hospice form)

Signature of attending physician _____

### REPORT

**Findings**  MSW visit. SW arriving at 2 Pm. met ē Donna Gifford RN and Kathlyn RN to receive report prior to seeing patient. (SO) Chantelle Thonor in patient's room. Chantelle had talked to pt stating "it's ok to go Joe" held his hand and sat at bedside. While Kathy-m RN Hospice SW & Chantelle gf were at bedside patient took his last breath and expired. Chantelle wished to clean his body and change his clothing. She has informed Joe's sister in Miami and various friends of his death. She awaits married male friend to arrive before funeral home is contacted. Hospice was notified of pt's passing at 2:15 Pm – report to Tish in office. Time of death was 2:10 Pm. Chantelle reviews other assets ē Joe and has contacted Ann Maria Ruggiero @ Partners Bereavement Dept.

**Diagnosis**  To relieve finances for arrangements already made. Pt had been in touch ē lawyer & Bereavement Dept concerning

**Recommendations**  fear of employment, last Friday.

recommend bereavement follow up by Hospice as Chantelle has 16 yo dtr and 9 yo dtr Both close to patient.

**Date of consultation**

SSVNA HOSPICE                                    Signature of Consultant
781-843-0947    REGINA TEMPESTA LICSW    (Regina Tempesta LICSW)

WHF-NUR-144

THERAPY
RESOURCES
MANAGEMENT, L.L.C.

# INTERDISCIPLINARY REHABILITATION
# SCREENING FORM

RESIDENT NAME: _Pamphile, Joseph_                    ROOM # _247_

Reason for Screen.  _✓_ Admit  ___ Readmit  ___ Annual  ___ Significant Change  ___ Referral

| Information reflects a one-time screening. | No Deficit | Existing Deficit - No Change in Function | New or Existing Deficit - Change in Function |
|---|---|---|---|
| **Does the resident have difficulty with. . . .** | | | |
| DRESSING — upper or lower body dressing, buttons, zippers, velcro, shoes, adaptive aids? | | | ✓ |
| FEEDING — bringing food to mouth, chewing, adaptive aids, weight loss? | | | ✓ |
| SWALLOWING — choking/coughing when eating/drinking, pocketing foods, weight loss? | | | ✓ |
| TOILETING — transferring on / off toilet, managing personal hygiene, managing clothing? | | | ✓ |
| GROOMING / HYGIENE — combing hair, brushing teeth, washing hands / face, shaving, maintaining hygiene? | | | ✓ |
| BATHING / SHOWERING — transferring in / out of shower/tub, washing all body areas in shower/tub/sponge bath? | | | ✓ |
| COMPREHENSION / SAFETY — knowing day/date, room location, DR, bathroom, activities, making safe decisions? | | | ✓ |
| COMMUNICATION/SPEECH AND VOICE — speaking clearly, slurring, mumbling, making needs known? | | | ✓ |
| HEARING — hearing throughout the environment and with various residents / staff? | | | ✓ |
| RANGE OF MOTION — moving arms/legs/hands, contractures, complaints of pain when moving? | | | ✓ |
| POSITIONING — leaning to one side while sitting, falling out of chair/bed, changing position in chair/bed? | | ✓ | |
| SKIN INTEGRITY — wounds / pressure ulcers? | ✓ | | |
| BED MOBILITY — moving in bed with or without assistive devices, going to/from lying position, side to side? | | | ✓ |
| BALANCE — maintaining balance when standing / walking, recovering loss of balance? | | | ✓ |
| TRANSFERS — moving to and from bed/chair/wheelchair, up from floor? | | | ✓ |
| WHEELCHAIR MOBILITY — rolling W/C, managing W/C parts, maintaining proper body alignment in W/C? | | | ✓ |
| AMBULATION — shuffling feet, limping, loss of balance, falling, using walker / cane? | | | ✓ |

**Additional Comments**

Pt c̄ severe cog. + physical limits, grossly non-responsive to all stimuli (pain occ. per hx) Non-appropriate for skilled the

Clinician Gathering Data: _____ Apr PT          3/23/06          _____ Signature / Date

| Physical Therapy: | Occupational Therapy: | Speech Language Pathology: |
|---|---|---|
| ___ Request Evaluation | ___ Request Evaluation | ___ Request Evaluation |
| ✓ No Evaluation | ✓ No Evaluation | ✓ No Evaluation |

# SOCIAL SERVICE PROGRESS NOTES

PATIENT NAME: Joseph Pamphile    DOCTOR Bregolis                    ADM. NO.

| DATE | |
|------|---|
| | Admission |
| 3-21-05 | Mr. Pamphile is a 47 y.o. male who was admitted to Colonial Nursing Home from Brigham & Women's Hospital on 3-21-05. He had presented with Δ mental status & acute renal failure. Has nonhodgkins lymphoma. Lumbar puncture showed metastisis to his spine. EEG showed diffuse encephalopathy. Pt. was A+O x3, DNR/DNI. HCP is Pt's girlfriend. Has restraining orders ag.t. wife. Family & friends visit daily & Haitian. On Hospice of South Shore. |
| 3-23-05 | Final Note |
| | Pt expired at 2:10PM. His passing was peaceful. Girlfriend & hospice social worker were with him. Remains to Cartwright Funeral Home, Randolph. — Arden Burns, LICSW |

Home > Compensate Employees > Administer Base Benefits > Use > Life and AD/D Benefits          New Window

| Elections | Beneficiaries |

Pamphile,Joseph                    Employee          ID: 003473890        Empl Rcd#:    0

| Plan Type | | Find | View 1 | First | 1-8 of |

Benefit Plan Type:    Life

| Coverage | | Find | View 1 | First | 1-5 of 5 |

Coverage Begin Date:    03/24/2005        Effective Date:        03/27/2005

Benefit Plan:

| Dependent/Beneficiaries | | | | | | Find | View All | First | 1 of 1 |

| *ID | Name | Relationship | Smoker | Percent of Benefit | Flat Amount | Excess | Contingent |
|-----|------|--------------|--------|---------------------|-------------|--------|------------|
| 🔍 | | | | | | ☐ | ☐ | ⊞ |

Total Primary Percent:
Total Contingent Percent:

Coverage Begin Date:    03/10/2005        Effective Date:        03/10/2005

Benefit Plan:        BSL            Basic Life Ins Under Age 65

| Dependent/Beneficiaries | | | | | | Find | View 3 | First | 1-4 of 4 |

| *ID | Name | | Smoker | Percent of Benefit | Flat Amount | Excess | Contingent |
|-----|------|--------|--------|---------------------|-------------|--------|------------|
| 02 🔍 | Pamphile,Beverly | Child | ☐ | 25 | | ☐ | ☐ | N |
| 06 🔍 | Pamphile,Sonia | Other | ☐ | 25 | | ☐ | ☐ | N |
| 07 🔍 | Phanor,Chantel | Other | ☐ | 25 | | ☐ | ☐ | N |
| 08 🔍 | Cesar,Widlene | Other | ☐ | 25 | | ☐ | ☐ | N |

Total Primary Percent:    100
Total Contingent Percent:

Coverage Begin Date:    11/12/2004        Effective Date:        11/12/2004

Benefit Plan:        BSL            Basic Life Ins Under Age 65

| Dependent/Beneficiaries | | | | | | Find | View 3 | First | 1-4 of 4 |

| *ID | Name | | Smoker | Percent of Benefit | Flat Amount | Excess | Contingent |
|-----|------|--------|--------|---------------------|-------------|--------|------------|
| 02 🔍 | Pamphile,Beverly | Child | ☐ | 15 | | ☐ | ☐ | N |
| 03 🔍 | Pamphile,Judy | Child | ☐ | 25 | | ☐ | ☐ | N |
| 04 🔍 | Pamphile,Jeffrey | Child | ☐ | 45 | | ☐ | ☐ | N |
| 05 🔍 | Pamphile,Brunel | Child | ☐ | 15 | | ☐ | ☐ | N |

Total Contingent Percent:

| Coverage Begin Date: | 01/26/2002 | Effective Date: | 01/26/2002 |
|---|---|---|---|
| Benefit Plan: | BSL | Basic Life Ins Under Age 65 | |

**Dependent/Beneficiaries**          Find | View All    First  1 of 1

| *ID | Name | Smoker | Percent of Benefit | Flat Amount | Excess | Contingent |
|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |

Total Primary Percent:

Total Contingent Percent:

| Benefit Plan Type: | Supplemental Life |
|---|---|

**Coverage**          Find | View 1    First  1-2 of 2

| Coverage Begin Date: | 03/10/2005 | Effective Date: | 03/10/2005 |
|---|---|---|---|
| Benefit Plan: | SUL5X | Employee Supplemental Life 5X | |

**Dependent/Beneficiaries**          Find | View 3    First  1-4 of 4

| *ID | Name | Smoker | Percent of Benefit | Flat Amount | Excess | Contingent |
|---|---|---|---|---|---|---|
| 02 | Pamphile,Beverly | Child | | 25 | | | N |
| 06 | Pamphile,Sonia | Other | | 25 | | | N |
| 07 | Phanor,Chantel | Other | | 25 | | | N |
| 08 | Cesar,Widlene | Other | | 25 | | | N |

Total Primary Percent:    100

Total Contingent Percent:

| Coverage Begin Date: | 01/26/2002 | Effective Date: | 01/26/2002 |
|---|---|---|---|
| Benefit Plan: | SUL5X | Employee Supplemental Life 5X | |

**Dependent/Beneficiaries**          Find | View All    First  1 of 1

| *ID | Name | Smoker | Percent of Benefit | Flat Amount | Excess | Contingent |
|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |

Total Primary Percent:

Total Contingent Percent:

| Benefit Plan | AD/D |
|---|---|

04/20/2005 11:38 FAX 617 724 2266

SEARCH KEY: 3473890                          SEARCH TYPE: E
    NAME  PAMPHILE, JOSEPH              UNIT NO  347 38 90
       GBC  0     GBC DATE  01 03 1989 COMPANY NO  07 WEEKLY
           STATUS  01     STD HRS   40.00      BUDGET  0010


    BASIC EMPLOYEE LIFE       BASIC EMPLOYEE AD&D   CASH BALANCE RET PLAN
1: PAMPHILE,RUTH
2: PAMPHILE,BEVERLY
   CODE: 2 DATE: 07 01 1996 CODE:  DATE:        CODE:  DATE:


    OPTIONAL EMPLOYEE LIFE   OPTIONAL EMPLOYEE AD&D
1:
2:
   CODE:  DATE:          CODE:  DATE:


             TRANSACTION DATE 12 12 2001  USER ID  IS2
MSG:                       PF7  - BASIC & OPT LIFE/ADD SELECTION
                           PF8  - CHOICE PAY/PARTNERS MATCH
                           PF9  - BASIC & OPT LIFE/ADD SELECTION
PF2 - UNIT NUMBER          PF10 - BENEFITS MENU
PF3 - NAME                 PF12 - ALL-SCREEN MAIN MENU
PF4 - SOC SEC NO                                  => _____

```
                    * 2002 BASIC AND OPTIONAL LIFE/AD&D SELECTION * HR72 01 0072

SEARCH KEY: 3473890                              SEARCH TYPE: E
        NAME  PAMPHILE, JOSEPH                        UNIT NO  347 38 90
  EMP CODE  A    ELIG  Y    ELIG DATE 07 01 1996  COMPANY NO  07 WEEKLY
  DOB  01 26 1958 GBC   0    GBC DATE 01 03 1989      BUDGET  0010
              STATUS  01     STD HRS   40.00      STD GROSS      649.20
DESCRIPTION            PLAN   COVERAGE       DEDUCTION       DATE      EOI

BASIC EMPLOYEE LIFE           34000.00                    07 01 1996
BASIC EMPLOYEE AD&D           34000.00                    07 01 1996
OPT EMPLOYEE LIFE        5   170000.00                    07 01 1996
OPT EMPLOYEE AD&D        1    34000.00          3.92      07 01 1996    5
OPT SPOUSE LIFE        50    50000.00          .10      07 01 1996
OPT SPOUSE AD&D        25    25000.00          1.26      07 01 1996   50
OPT CHILD LIFE          X    10000.00          .08      07 01 1996
OPT CHILD AD&D          X    10000.00          .48      07 01 1996
                                               .05      07 01 1996

MSG:                                  TRANSACTION DATE 12 12 2001 USER ID IS2
                                        PF7  - SPOUSE/DEPENDENT PROFILE
                                        PF8  - BENEFICIARY PROFILE SCREEN
  PF2 - UNIT NUMBER                     PF10 - BENEFITS MENU
  PF3 - NAME                            PF12 - ALL-SCREEN MAIN MENU
  PF4 - SOC SEC NO                                           => _____
```

Please Allow Debra Rufo my
Manager to Change my Beneficiary
to my sister Sonia pamphile; Chantel pharor
Widlene cesar, Beverly pamphile. as of
3/10/05.

3-10-2005

E ӘSEOGTTENA
OSILAMA
Alpina Williams 3/10/05

Chaney, Paul J.

| | |
|---|---|
| **From:** | Sogolow, Andrew |
| **Sent:** | Thursday, March 10, 2005 2:52 PM |
| **To:** | Chaney, Paul J. |
| **Subject:** | FW: Joseph Pamphile |

I spoke with Gail Knight who is with Christopher Woods and Joseph and his family at the hospital. I am answering the questions below in the email below. I understand they are sending an updated form with his girlfriend/caretaker who he has been with for the past "4 years" Chantel Phanor included with the other three beneficiaries.

> ——Original Message——
> **From:** Sogolow, Andrew
> **Sent:** Thursday, March 10, 2005 2:37 PM
> **To:** Woods, Christopher
> **Subject:** Joseph Pamphile

Hi Chris,

Sorry that in the midst of Joseph's terminal illness I have to ask you all this, but please help where you can.

When the request to change beneficiaries came over, asking for Deb Rufo to have permission to make the changes(Deb in fact having Benefits enter the data since she and I can not) It lists his sister Sonia, Widiene Cesar(Sister) and his daughter Beverly. We don't have a "relationship" to put in the system for Widiene, can you clarify?

Is Sonia to be the primary and the other 2 the secondary beneficiaries, or is Joseph asking for this to be split in 3rds equally? Including Chantel Phanor, to be split equally 4 ways.

Also, if he is still legally married, the "survivor benefit pension" will still go to the wife, unless she signs a form benefits can provide saying otherwise. Process of finalizing divorce, but they all agree she is entitled to this benefit.

Previously he listed Judy, Jeffrey and Brunel his "other" children and Ruth, his spouse as beneficiaries, as this was written, they would be removed from the PeopleSoft Beneficiary Profile, is that the expectation Joseph expressed?. Yes, remove them please.

I am not at all advising on how to proceed, nor am I providing any legal counsel, for that a lawyer is needed, just explaining how the system works.

I understand Dutchess was a "witness" on the letter, having not seen the letter myself, there was another signature, any idea who that was? Other signature?

Sorry for all the questions.

Thanks.
Andy

**HR Generalist/Partners Finance**
**One Constitution Center, 121**
**Charlestown, MA 02129**
**Tel. 617.724.2641 Fax. 617.726.9624(HR office area)**
**email: asogolow@partners.org**

*[handwritten:]*
Beverly – Daughter
Sonia Sister
Widiene Sister
Chantel Friend
Phanor

*[handwritten:]*
per Paul Chaney –
split equally by (4)
Life Insurances only – dj 3/10/05

The Commonwealth of Massachusetts
STANDARD CERTIFICATE OF DEATH
REGISTRY OF VITAL RECORDS AND STATISTICS

INSTRUCTIONS ON REVERSE SIDE
FOR USE BY PHYSICIANS AND MEDICAL EXAMINERS

| | | |
|---|---|---|
| DECEDENT - NAME FIRST | MIDDLE | LAST |
| 1 Joseph | Pamphile | SEX 2 M. DATE OF DEATH 3 March 23, 2005 |

| | | |
|---|---|---|
| PLACE OF DEATH (City/Town) 4a Weymouth | COUNTY OF DEATH 4b Norfolk | HOSPITAL OR OTHER INSTITUTION Colonial Nursing & Rehab. Center |

PLACE OF DEATH (Check only one): HOSPITAL: ☐ Inpatient ☐ ER/Outpatient ☐ DOA    OTHER ☒ Nursing Home ☐ Residence ☐ Other (Specify)

SOCIAL SECURITY NUMBER 6 ████91    IF US WAR VETERAN SPECIFY WAR

WAS DECEDENT OF HISPANIC ORIGIN? (If yes, Specify Puerto Rican, Dominican, Cuban, etc.) ☒ NO ☐ YES  8a Specify:

RACE (e.g. White, Black, American Indian, etc.) 8b Black

DECEDENT'S EDUCATION Elementary Sec (0-12) 12  College (1-4, 5+) +4

AGE - Last Birthday (Yrs.) 9 47    DATE OF BIRTH (Mo., Day, Yr.) Jan. 26, 1958    BIRTHPLACE (City and State or Foreign Country) Port Au Prince, Haiti

MARRIED, NEVER MARRIED WIDOWED OR DIVORCED 12 Married    LAST SPOUSE (If wife, give maiden name) Ruth Temosthenes    USUAL OCCUPATION (Prior - If Retired) 14a Accountant    KIND OF BUSINESS OR INDUSTRY 14b Health Care

RESIDENCE - NO. & ST., CITY/TOWN, COUNTY, STATE/COUNTRY 15a 1751 Washington Street, No. 6, Braintree, Norfolk, MA    ZIP CODE 15b 02184

FATHER - FULL NAME 16 Brunet Pamphile    STATE OF BIRTH (If not in US, name country) 17 Haiti    MOTHER - NAME (GIVEN) (MAIDEN) 18 Eliamene Sainilus    STATE OF BIRTH (If not in US, name country) 19 Haiti

INFORMANT'S NAME 20 Widlene Cesar    MAILING ADDRESS - NO. & ST., CITY/TOWN, STATE, ZIP CODE 21 11960 N. E. 16th Avenue, Miami, FL 33161    RELATIONSHIP 22 Sister

METHOD OF IMMEDIATE DISPOSITION 23 ☐ BURIAL ☐ CREMATION ☐ ENTOMBMENT ☒ REMOVAL FROM STATE ☐ DONATION ☐ OTH. SPEC.    FUNERAL SERVICE LICENSEE OR OTHER DESIGNEE 24 James A. Whalen Jr.    LICENSE # 25 43114

PLACE OF DISPOSITION (Name of Cemetery, Crematory or other) 26a Duplante Cemetery    LOCATION (City/Town, State) 26b Fermathe, Haiti

DATE OF DISPOSITION (Mo., Day, Yr.) 27 March 31, 2005    NAME AND ADDRESS OF FACILITY OR OTHER DESIGNEE 28a&b Cartwright Funeral Home, 419 No. Main Street, Randolph, MA 02368

29 PART I - Enter the diseases, injuries, or complications that caused the death. Do not use only the mode of dying, such as cardiac or respiratory arrest, shock or heart failure. List only one cause on each line (a through e) PRINT OR TYPE LEGIBLY.

Approximate Interval Between Onset and Death

IMMEDIATE CAUSE (Final disease or condition resulting in death) a. Lymphoma    Years

DUE TO (OR AS A CONSEQUENCE OF)

Sequentially list conditions, if any, leading to immediate cause. Enter UNDERLYING CAUSE (disease or injury that initiated events resulting in death) LAST

b. _____ DUE TO (OR AS A CONSEQUENCE OF)
c. _____ DUE TO (OR AS A CONSEQUENCE OF)

PART II - Other significant conditions contributing to death but not resulting in underlying cause given in Part I. 30

WAS AUTOPSY PERFORMED? (Yes or No) 31 No    WERE AUTOPSY FINDINGS AVAILABLE PRIOR TO COMPLETION OF CAUSE OF DEATH? (Yes or No)

MED. EXAM. NOTIFIED? (Yes or No) 33 No    MANNER OF DEATH 34 ☒ NATURAL ☐ HOMICIDE ☐ COULD NOT BE DETERMINED ☐ ACCIDENT ☐ SUICIDE ☐ PENDING INVESTIGATION    DATE OF INJURY (Mo., Day, Yr.) 35a    TIME OF INJURY 35b    INJURY AT WORK (Yes or No) 35c

DESCRIBE HOW INJURY OCCURRED 35d    PLACE OF INJURY (At home, farm, street, factory, office bldg., etc.) Specify 35e    LOCATION (No. & St., City/Town, State) 35f

36a To the best of my knowledge, death occurred at the time, date, and place and due to the cause(s) as stated. (Signature and Title) Arthur B____

37a On the basis of examination and/or investigation in my opinion death occurred at the time, date and place and due to the cause(s) as stated. (Signature and Title)

DATE SIGNED (Mo., Day, Yr.) 36b MARCH 24, 2005    HOUR OF DEATH 36c 2:10 P    DATE SIGNED (Mo., Day, Yr.) 37b    HOUR OF DEATH 37c

NAME OF ATTENDING PHYSICIAN IF NOT CERTIFIER 36d    PRONOUNCED DEAD (Mo., Day, Yr.) 37d    PRONOUNCED DEAD (Hr) 37e

NAME AND ADDRESS OF CERTIFYING PHYSICIAN OR MEDICAL EXAMINER (Type or Print) 38 Arthur Bressli Jr MD 400 Washington St Braintree MA 02184    LICENSE NO. OF CERTIFIER 39 77050

WAS THERE A PRONOUNCEMENT FORM? (Yes or No) 40a Yes    IF YES, DATE PRONOUNCED 40b March 23, 2005    IF YES, TIME PRONOUNCED 40c 2:10 P    NAME OF PRONOUNCER 40d Kathryn Brown    TITLE ☒ R.N. ☐ P.A.

DATE BURIAL PERMIT ISSUED March 22, 2005    SIGNATURE-BD. OF HEALTH AGENT Richard T. Morin    RECEIVED IN THE CITY/TOWN OF WEYMOUTH    DATE OF RECORD MAR 25 2005

Pronouncement of Death Form (R-302) on File: ☒

PERMANENT BLACK INK ONLY
R-301-01

I, FRANKLIN FRYER, THE UNDERSIGNED, HEREBY CERTIFY, THAT I HOLD THE OFFICE OF TOWN CLERK OF THE TOWN OF WEYMOUTH IN THE COUNTY OF NORFOLK, AND COMMONWEALTH OF MASSACHUSETTS; THAT THE RECORDS OF BIRTHS, MARRIAGES, AND DEATHS ARE IN MY CUSTODY AND THAT THE ABOVE IS A TRUE COPY FROM THE RECORDS, AS CERTIFIED BY ME.

WITNESS MY HAND AND THE SEAL OF THE TOWN OF WEYMOUTH _____ MAR 25 2005 DATE

_Franklin Fryer_
FRANKLIN FRYER, TOWN CLERK

**Plan Sponsor:** means the employer who makes this benefit plan available to you.

### PLAN MEMBERSHIP

### ELIGIBILITY FOR INSURANCE

This section tells how you may become insured. The term "personal insurance" means your insurance under the group policy with respect to yourself. Reference to "dependent insurance" means your insurance under the group policy with respect to your dependents.

**Personal Insurance**

To obtain personal insurance, you need to be a qualified employee. You are a "qualified employee" only if you meet all of these requirements:

1. you are a full–time employee of the plan sponsor, working for pay on a scheduled normal work week of at least 20 hours, and
2. you perform that work at the plan sponsor's usual place of business, except for duties of a kind that must be done elsewhere, and
3. you are in a covered employment class named in the group policy.

Specific information regarding the group policy and its terms may be obtained from the plan sponsor.

If you are a qualified employee on the Effective Date, you are eligible for personal insurance on that date. Otherwise, you become eligible on the date you become a qualified employee.

**Dependent Insurance**

If you are a qualified employee, you may obtain dependent insurance for your qualified dependents. Your "qualified dependents" are your spouse and children as defined and limited here.

The term "spouse" m eans your husband or wife. Your marriage must not have ended in a valid divorce decree or annulment.

The term "spouse" also includes your same-sex domestic partner. You and your same-sex domestic partner must meet the following criteria to qualify your same-sex domestic partner for insurance under this group policy. You and your same-sex domestic partner:

28518-A (1/1/2001)                8



**PARTNERS.**
HEALTHCARE SYSTEM

**Beneficiary Change Form**

## SECTION I - EMPLOYEE INFORMATION

Employee Name _Joseph PH RANDA PHILAI_

_Please PRINT legibly_                    Today's Date _3-20-05_

Unit/Emp.ID Number: _3473890_

Signature _[signature]_

Marital Status:
Single ☐ Married ☐ Divorced ☐ Widowed ☐ Separated ☑

**Please check all programs that you wish this beneficiary designation to cover:**
Contact your TSA vendor for a form to designate beneficiaries for your voluntary contributions or for Partners matching account.

|  | Core | Optional |
|---|---|---|
| Group Term Life Insurance | _____ | _____ |
| AD&D Insurance | _____ | _____ |
| Cash Balance Retirement Plan | _____ | |

**You _must_ complete Section III on back of this form if you are married and have designated a beneficiary other than your spouse for the retirement plan. Your spouse must consent to this designation.**

## SECTION II - DESIGNATION OF BENEFICIARY

Primary Beneficiary                              Beneficiary Code _2_
Name                          Address                    (See below)
                                                         Soc. Sec. #
_Chantal Mcaur_      _1757 Washington St Braintree, Ma 02184_   ████

**Contingent Beneficiary(ies)**
Name                          Address              Soc. Sec. #
_Widlene Cesar_    _1960 NE 16th Ave. Apt 101, Miami, Fla 3316_  ████

Beneficiary Codes: 1 = one beneficiary; 2 = primary if living, otherwise contingent; 3 = equally to survivors; 4 = primary with children as contingent; 5 = other

In the event of your death, payment will be based on the most current designation on file with Human Resources. This designation will remain in effect until changed by you in writing or as required by the provisions of the plan. Please keep a copy of this form for your records.

**If the back of this form is not completed, we will be unable to honor a designation other than your spouse for your cash balance retirement plan.**

*Please deliver to* Cynthia Paretta
Unicare

Alanna G. Cline

300 Market Street
Brighton, Massachusetts 02135
Telephone 617 783 5997

## Facsimile Transmittal

Date  4-11-05                 Time  11:15

Telecopier#

978-247-6529

Number of Pages Including Cover Sheet  2

Comments:  Please note - e-mailed twice 4/8/05
unsuccessfully!
Fr. Joseph Pemphile

*****************CONFIDENTIALITY NOTICE**********************
The documents accompanying the Fax transmission contains information from the law firm of
Alanna G. Cline which is confidential and privileged.  The information is intended to be for the
use of the individual or entity named on this transmission and no other person.  I you are not the
intended recipient you may not review or re-transmit the contents.
IF YOU HAVE RECEIVED THIS FAX IN ERROR.  PLEASE NOTIFY US BY TELEPHONE
IMMEDIATELY SO THAT WE CAN ARRANGE FOR THE RETRIEVAL OF THE
ORIGINAL DOCUMENTS.

*Law Office of:*
## Alanna G. Cline

*300 Market St.*
*Brighton, Massachusetts 02135*
*Telephone 617 783 5997*

April 8, 2005

To: Unicare

Attn: Cynthia Paralta
@wellpoint.com

Dear Ms. Paralta,

Take notice that by order of Sean M. Dunphy, Chief Justice of the Family and Probate Court of the Commonwealth of Massachusetts, Mr. Joseph Pamphile was enjoined and restrained from changing any beneficiary on any life insurance. The order, dated January, 2000, applies to all plaintiffs in divorce in this state. Mr. Pamphile was a divorce plaintiff in this state, having filed his complaint in 2001. The purpose of the court's order was to protect life insurance and assets for dependents, such as Mr. Pamphile's wife and children. Mr. Pamphile leaves his wife and four children. The youngest child is four years old, so you can understand how important this issue is.

Take notice as well that as a result of this Standing Order, Mr. Pamphile lacked the legal authority to effect any such change. To the extent that Partners or Unicare aides, assists, or abets in the transmission of any life insurance proceeds on account of Mr. Pamphile death to any person other than the beneficiary named at the time the order applied (July, 2000), then Unicare and Partners may be deemed his agents, and may be deemed responsible for any loss associated by Mrs. Pamphile.

We will appreciate your prompt efforts to stop any payment in transmission. If there is any doubt as to who is entitled to life insurance proceeds, we are glad to have the matter submitted to the court for determination. In that event, Unicare and Partners will avoid and avert any liability exposure to Mr. Pamphile's wife and children.

Thank you for your prompt attention.

-1-

Commonwealth of Massachusetts
The Trial Court
Probate and Family Court Department

Supplemental Probate Court Rule 411. Automatic Restraining Order

Notice to Plaintiff

(a) The following automatic restraining order shall apply to both parties to a complaint for divorce or separate support. This automatic restraining order shall be effective with regard to the plaintiff upon the filing of the complaint by the plaintiff or the plaintiff's counsel and with regard to the defendant upon service of the summons and complaint or any other acceptance of service by the defendant.

After service of the complaint for divorce or separate support, on two (2) days' notice to the other party or on such shorter notice as the court may prescribe, a party may appear without thereby submitting his person to the jurisdiction of the court, and move to modify or dissolve the automatic restraining order and in that event the court shall proceed to hear and determine such motion as expeditiously as the ends of justice require.

This order is in effect until the earliest of the following: (1)the order is modified or dissolved by the court; (2)the order is modified by a written agreement of the parties with court approval; (3)the entry of a judgment of divorce or separate support; (4)the action is dismissed; or (5)by further order of the court. FAILURE TO COMPLY WITH THIS ORDER MAY BE DEEMED A CONTEMPT OF COURT.

The following order PROHIBITS either party to a complaint for divorce or separate support from:

(1) Selling, transferring, encumbering, concealing, assigning, removing or in any way disposing of any property, real or personal, belonging to or acquired by, either party, except: (a) as required for reasonable expenses of living; (b) in the ordinary and usual course of business; (c) in the ordinary and usual course of investing; (d) for payment of reasonable attorney's fees and costs in connection with the action; (e) by written agreement of both parties; or (f) by Order of the Court.

(2) Incurring any further debts that would burden the credit of the other party, including but not limited to further borrowing against any credit line secured by the marital residence or unreasonably using credit cards or cash advances against credit or bank cards;

(3) Directly or indirectly changing the beneficiary of any life insurance policy, pension or retirement plan, or pension or retirement investment account, except with the written consent of the other party or by Order of the Court.

(4) Directly or indirectly causing the other party or the minor child(ren) to be removed from coverage under an existing insurance policy or permitting such coverage to lapse, including medical, dental, life, automobile, and disability insurance. The parties shall maintain all insurance coverage in full force and effect.

(b) The provisions contained in the new summons for divorce or separate support must be served on the defendant, except if personal service is not made as provided in Rule 4 and service is made by publication, said notice shall include a statement that an automatic restraining order has been issued pursuant to this rule. The provisions of this automatic restraining order need not be reprinted in said public notice.

Date Rule Effective: January 1, 2000.

Chief Justice

CJ-D 110S (01/00)

# Documentation

| Name | Joseph Pamphile  **Policy Number** 28518  **Claim No.** 0502345 & 0502347 |
|------|------|

| 5/17/05 | I spoke with Anne Marie to have her help interpret the beneficiary screen prints she sent us.

She explained that on 3/10/05 he made a change to both basic and supp life. He did this in writing and she is going to fax me the change form. She stated that 11/24/04 was the prior designation. She explained that the reason the 1/26/02 was because of a system conversion they had. The form that says "2001 Beneficiary Profile" that code 2 means one primary. Therefore, on this form Ruth Pamphile was the primary beneficiary and Beverly Pamphile is the contingent. The date next to code 2 that says 7/1/96 is the date this designation was made.

She also told me that Jopseh Pamphile called her on 3/18/05 to ask who his beneficiaries were. She told him and he said he wanted to change it. He came into the office to see his manager and made the final change on 3/20/05.

*Helene Hunter*
Helene Hunter |